**KERR–McGEE REFINING CORPORATION, Kerr-McGee Corporation, Plaintiffs,**

v.

**M/V LA LIBERTAD, her Engines, Tackle, etc. and Consorcio Naviera Peruano, S.A., Defendants.**

No. 80 CIV 2710 (LBS).

United States District Court, S. D. New York.

Sept. 14, 1981.

Bigham, Englar Jones & Houston, John T. Kochendorfer, New York City, for plaintiffs.

Freehill, Hogan & Mahar, Robert L. Mahar, Peter D. Clark, New York City, for defendants.

OPINION

SAND, District Judge.

Kerr-McGee Refining Corporation and Kerr-McGee Corporation (hereinafter collectively "Kerr-McGee") have brought this action to recover for an alleged short delivery of cargo of Ninian crude oil transported aboard the M/V La Libertad, a vessel owned by defendant Consorcio Naviera Peruano, S.A., together with money expended for additional barge hire, dock time and inspection costs. The case has been tried to the Court and our findings of fact and conclusions of law follow.

FACTS

On or about January 30, 1980, a shipment of 436,685 gross barrels of Ninian crude oil, or 436,099 net barrels of Ninian crude oil were loaded into defendant's vessel at Sullom Voe, Scotland, for delivery to the Texoma Pipeline at the Sunoco Terminal in Beaumont, Texas. Plaintiffs had chartered the vessel pursuant to a charter party, the relevant provisions of which are:

"PART II, Paragraph 9.

SAFE BERTHING–SHIFTING. The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to next berth, charges for running lines on arrival at and leaving that berth, additional agency charges and expense, customs, overtime and fees, and at any other extra port charges or port expenses incurred by reason of using more than one berth. Time consumed on account of shifting shall count as used lay time except as otherwise provided in Clause 15."

A rider to the charter party contains the following provisions:

"10. Owner Warrants that the vessel will discharge the entire cargo within twenty-four (24) hours or maintain 100 PSI at ship's rail, provided shore facilities permit....

13. Owners agree to use Charterer's agent at discharge port."

Although the M/V Libertad had a maximum cargo limit of 69,000 tons and, under the terms of the charter, plaintiffs could have transported that quantity of cargo without incurring additional freight charges, the plaintiffs instructed the vessel to load only 58,000 tons to maintain a maximum draft of 40 feet, fresh water. Michael Arnold, plaintiffs' manager for foreign oil operations, testified that this was done in order to permit the vessel to dock alongside in Beaumont, Texas, thus avoiding the risks and costs of lightering.

The voyage from Sullom Voe to Texas ran into bad weather, and telexes sent by the vessel to Texas informed that damage had occurred, that cargo had shifted and that a break had occurred in a pipeline which served as part of the hydraulic system of the vessel. This necessitated ballasting as a consequence of which the vessel's fresh water draft increased to 45 feet.

Arnold testified that he went to Beaumont, Texas, arriving while the vessel was en route. In Texas, Arnold was told by Gulf Coast Marine, an agency servicing vessels at the Sunoco Terminal at Beaumont, Texas, that the vessel had been in an accident and would have to be lightered to get into port. Arnold went out to the ship and inspected the cargo. Before any discharge of cargo took place, ullage and BS&W (basic sediment and water) readings were taken aboard the Libertad.[1] The results of these readings are contained in a report

---

1. As explained in *Northeast Petroleum v. Prairie Grove*, 1977 AMC 2139, 2141 n.1 (S.D.N.Y. 1977): "Ullage ... is the distance from the top of the tank down to the surface of the cargo. By comparing the known volume of the tank with the computed volume of the empty space above the cargo, one can establish the volume of the cargo and then its weight."

prepared by a surveyor and indicate 438,-754.60 net barrels aboard the Libertad. Plaintiffs exhibit 11 at 5.

Arrangements were then made for the engagement of barges to lighter the crude oil from the vessel, moored offshore, to the Texoma Pipeline Terminal. One of the key disputed issues in the case is which party is ultimately liable for the cost of this barging.

Arnold testified that the Libertad, which was new to this trade, was experiencing difficulty in establishing credit and Arnold agreed, on behalf of the plaintiffs, to pay the barge fees to assure the discharge of the cargo by the barge operators (who might otherwise have held up delivery pending payment). This oral agreement was entered into between Arnold and Cecil Hightower, the manager of Gulf Coast Marine, prior to the arrival of the barges. Plaintiffs contend that the barge cost, which it agreed to pay, was for the account of the defendant and that the agreement to advance the funds was simply to facilitate prompt delivery of the cargo without any assumption of ultimate liability for these costs. Defendant contends that the costs of lightering are, under the charter party, the owner's responsibility; that Gulf Coast Marine was in this regard plaintiffs' agent; and that the advancing of funds for the barging by plaintiffs confirmed these understandings and agreements.

The M/V La Libertad discharged approximately one-quarter of its cargo into three barges and discharged the remaining three-quarters of its cargo at the Sunoco Terminal, coming alongside after the barges had been loaded. The barges, in turn, discharged their cargo at the Sunoco Terminal. At dockside, dripline samples were taken for the purpose of measuring BS&W which is a measure of the quantity of unusable and unmarketable impurities which have been mingled with the cargo. From the dockside, some or all of the crude oil discharged from the M/V Libertad and from the barges which discharged cargo at another point at the Terminal was pumped respectively two and one-half and three miles onshore, at which point the amount of crude oil was measured by passage through meters.

The parties have entered the following stipulation:

"The quantities aboard the vessel when it arrived, that were discharged at the Terminal, are set forth in the ullage reports of E. W. Saybolt on behalf of the vessel owner."

Pretrial order ¶ 4. The major dispute between the parties is whether the ullage measurements or the meter readings contained in those reports should govern our determination with respect to plaintiffs' shortage claim. Plaintiffs rely on the meter readings which reflect delivery of only 420,694 net barrels at the Texoma Pipeline, although 436,099 net barrels were loaded at Sullom Voe. This difference is reflected in the summary sheet of the report prepared by E. W. Saybolt & Co., Inc., marine oil surveyors, dated March 7, 1980 (Plaintiffs' Exhibit 10). Based on this report, plaintiffs contend that the defendant failed to deliver 15,404.98 barrels of crude oil. The shortage claimed is based on computations made from meter readings and an analysis of the quantity of basic sediment and water contained in cargo delivered by the defendant. It is the plaintiffs' contention that the report reflecting this shortage is more accurate than the ullage reports and the testing for basic sediment and water conducted aboard the vessel. The defendant contends, on the other hand, that the plaintiffs have not proven that there was a shortage of delivery and that the measurements and computations upon which plaintiffs rely were not accurate, were not proven at the trial and in any event, measured the crude oil at a time and place subsequent to delivery as that term is defined in the charter party. Defendant relies on the ullage reports and ship's composite BS&W figures, which reflect a shortage of 1730.59 barrels, or .39%, a variance within the .5% tolerance allegedly accepted in the industry.[2] Defendant's Post Trial Brief at 39.

---

2. Defendant provided two alternative computations of the shortage reflected in the ullage reports. See id. We adopt the second alternative which yields a shortage of 1730.59 barrels

Plaintiffs seek to recover as follows:

| Crude Oil Shortage (15,404.98 barrels at $36.78) | $ 566,595.16 |
|---|---|
| Barge Costs | 105,875.00 |
| Inspection Costs | 2,155.98 |
| Customs Expense (excess) | 640.00 |
| Excessive dock time | 30,574.30 |
| Surveyor | 990.39 |
| | $ 706,830.83 |

We will deal with each of these items, but not necessarily in the order stated above. *For Whose Account and At Whose Risk was the Lightering Done?*

■ Defendant relies heavily on Part II, paragraph 9 of the charter party for the proposition that, as therein stated: "any lighterage [is] at the expense, risk and peril of the charterer." We interpret the clause, however, to deal with lighterage which occurs because the charterer has designated ports or cargo loads which necessitate such lighterage. Here the evidence indicates that the charterer deliberately limited the cargo load so as to enable discharge of cargo without resort to barges and lighterage. The need for barges arose solely as a result of the damages sustained by the vessel and the ballasting deemed necessary for the ship's stability after the cargo shifted. Thus, the barge costs incurred in this instance were not the type of costs envisioned by paragraph 9 of the charter party.

■ Nor do we find in the arrangement between Arnold, on behalf of plaintiffs, and Hightower of Gulf Coast Marine, anything which alters this result. Plaintiffs' advancing of the funds to facilitate a release of the cargo from the barges does not resolve the question of who, as between plaintiffs and defendant, should ultimately bear this expense. We find credible and accept Arnold's version of this arrangement, *i.e.*, a

because the first alternative did not deduct the cargo which was on board the barges when loaded and remained there after discharge.

**3.** Defendant contends that "absent express contractual incorporation, the relations between the parties to a contract of private carriage are never subject to the provisions of the Harbor Act or the Carriage of Goods by Sea Act." Defendant's Trial Brief at 7. In its post trial brief, defendant argues that because the

simple advance of funds for the account of the vessel owner.

■ Defendant also urges that Gulf Coast Marine was nominated by plaintiffs pursuant to paragraph 13 of the charter party and that any loss or expense resulting from the manner in which the lighterage occurred was not attributable to defendant. It appears that Gulf Coast Marine acted in some instances as defendant's agent as evidenced by the telexes from the vessel to it requesting services and supplies. In some instances, Gulf Coast Marine acted at plaintiffs' request. Insofar as the designation of barges is concerned, we find that Gulf Coast was acting on behalf of the vessel whose responsibility it was to deliver the cargo. Accordingly, we find that plaintiffs have sustained their burden of proving an entitlement to recovery of barge costs since these costs were incurred to enable defendant to fulfill its contractual obligation to deliver the cargo.

*The Alleged Short Delivery of Crude Oil*

■ To establish a prima facie case under the Carriage of Goods by Sea Act ("COGSA") 46 U.S.C. § 1300 *et seq.*, plaintiffs must establish the claimed shortage by a fair preponderance of the evidence. *Northeast Petroleum Corp. v. S.S. Prairie Grove*, 1977 AMC 2139 (S.D.N.Y.1977). *See Nissho-Iwai Co. v. M/T Stolt Lion*, 617 F.2d 907, 912 (2d Cir. 1980).[3] We find that plaintiffs have failed to meet this burden.

As noted *supra*, plaintiffs claim that there was a shortage of approximately 15,-000 barrels of crude oil based upon the meter readings. This contention is based upon the recital in the Saybolt report of

charter party is not governed by COGSA, the plaintiffs must show fault or negligence by the carrier. Defendant's Post Trial Brief at 6. This contention is totally without merit because, as plaintiffs point out, Part II, ¶ 20(b)(i) of the Charter Party contains a clause paramount incorporating COGSA. Such clauses are valid, *see Nissho-Iwai Co. v. M/T Stolt Lion*, 617 F.2d 907, 913 n.7 (2d Cir. 1980), and we therefore find that COGSA governs this dispute.

information furnished to Saybolt by Sunoco, Inc. as reflected in plaintiffs' Exhibit 10. Much of the trial was devoted to efforts to identify and explain why the Saybolt report reflects this shortage although the calculations based on ullage measurements made aboard the vessel before and after discharge and made aboard the barges failed to reflect such an extensive shortage.

Defendant, relying on such cases as *Northeast Petroleum Corp. v. S.S. Prairie Grove*, 1977 AMC, 2139 (S.D.N.Y.1977), takes the position that the ullage reports and other data contained in another Saybolt report dated March 6, 1980, plaintiffs' Exhibit 11, establish that substantially all of the crude oil loaded aboard the Libertad was in fact discharged and that the measurements upon which plaintiffs rely are not controlling since they are based on meter readings which took place at a point two and one-half to three miles from the point of delivery after the cargo left the defendant's possession and control. *Northeast Petroleum* does indeed support the proposition that where the charter party is similar to the one here at issue, the plaintiff may not base a claim of shortage upon computations (there a measurement of cargo contained in shore tank facilities) made at a point subsequent to the delivery point. Plaintiffs contend that *Northeast Petroleum* is distinguishable because the court in that case noted that there was an uneventful voyage and dry tank certificates were issued after the vessel was unloaded. In such a case, the plaintiffs concede, delivery takes place as provided in the charter party when the cargo passes from the vessel's permanent hose connections to connections provided by the plaintiffs. Here, however, plaintiffs assert it is known that there was a disturbance of cargo during the voyage (see, *e.g.*, plaintiffs' Exhibit 11, page 5, in which Saybolt notes that number 11 tank is leaking to the slop tanks); there was a utilization of barges which as we have noted above, was a responsibility of the defendant, not the

plaintiffs and there was some evidence that there had been a leaking of oil during the voyage.

We agree that the facts in *Northeast Petroleum* are somewhat distinguishable. First, no dry tank certificate was issued in this case. However, the significance of the lack of a dry tank certificate is diminished by the fact that a report was issued indicating the amount of cargo remaining on board after discharge, and that appropriate adjustments of the ullage figures were made. Second, this is not a case in which one can say that the cargo discharge took place in precisely the manner in which the charterer had intended and that any risks of loss or shortage in the delivery of the cargo were, by virtue of the agreement reached in the charter party between the owner and the plaintiffs, to be borne by the plaintiffs. This however, does not answer the more troubling question whether the plaintiffs have sustained their burden of proving the claimed shortage by a fair preponderance of the evidence. *See Northeast Petroleum v. S.S. Prairie Grove, supra.* We find that they have not met this burden.

■ Plaintiffs' primary reliance is upon the information contained in the Saybolt report furnished to Saybolt by Sunoco personnel not called as witnesses.[4] A significant source of the alleged discrepancy are the differences in the BS&W analysis made by Saybolt aboard the vessel and the barges as distinguished from the analysis made by Sunoco personnel and relayed to Saybolt based upon the dockside dripline sample. The plaintiffs contend that the sampling done aboard the vessel and barges is inaccurate, that in some instances the samples could not be taken and that the dripline report should control here. We reject this argument for several reasons. First, insofar as the delivery of cargo directly from the Libertad to the dockside is concerned, and this relates to three-quarters of the crude oil delivery, the delivery was indeed

4. Insofar as the alleged oil leaks or leaking tanks are concerned, the evidence that this occurred is skimpy at best. The vessel was ordered to remain at a lighterage point while

Coast Guard planes inspected the area for evidence of oil leakage and they reported that there were no signs of such leakage and so the vessel was permitted to come alongside.

made in the fashion contemplated by the parties. In other words, it is only insofar as barging was concerned that the expectations of the parties as to the mode of delivery were upset by the necessity to balast and utilize barges. Thus, with respect to at least three-quarters of the cargo, the defendant may properly invoke the provision of the charter party that the point of delivery was the permanent hose connection aboard the vessel, and with respect to the remaining quarter, delivery occurred when the cargo left the barges and entered the shore lines. *See Northeast Petroleum v. Prairie Grove*, 1977 AMC 2139, 2142 (S.D.N.Y.1977).

Plaintiffs simply have not shown any loss prior to delivery to the shore lines leading to the meter bank, and "[t]o require the carrier to inspect a maze of piping and storage tanks over which it had no control or expertise would be burdensome if not impossible." *Centercham Products, Inc. v. A/S Redereit*, 1972 AMC 373, 375 (E.D.Va. 1971); *Esso Nederland v. M.T. Trade Fortitude*, 1977 AMC 2144, 2147 (S.D.N.Y.1977) *aff'd without op.* 573. F.2d 1296 (1977). We note that, according to Mr. Cotton, the Cole-Brett inspector who was present when the Libertad discharged its cargo and who took ullage readings on the ship, oil can bypass the meters and go directly into the tank farm. Plaintiffs produced no evidence that all of the oil which left the Libertad and the barges went through the meters,

whether the lines which carried the oil were free of contamination or what route it followed after leaving the Libertad (*e.g.*, whether or not it was placed in shore tanks or went directly into the Texoma mainline). If plaintiffs had established that all of the cargo was placed in shore tanks, more accurate readings might have been made. However, it is unclear whether the cargo was placed in shore tanks or exactly what route it took, and we therefore will not give the meter readings precedence over the ullage readings.[5] Because of our finding that plaintiffs have not established the alleged shortage of 15,404.98 barrels based on the meter readings, we need not reach the defendant's contention that an adverse inference should be drawn from plaintiffs' failure to submit the shore tank readings which defendant contends are in plaintiffs' custody.

Second, the Court is not satisfied that the BS&W readings relied upon by the plaintiffs are any more accurate or persuasive than those taken aboard the vessel and barges. In this regard, we note the testimony of the defendant's expert, Mr. Dennelly, to the effect that a pipeline would not, in accordance with the practices of the industry, accept into the pipeline system crude oil having a BS&W content as high as the 6.5% which is reflected, for example, in the analysis done by Sunoco of the crude oil discharged from barge "Domar 6501", page 7 of plaintiffs' Exhibit 10.[6]

5. Our conclusion is not altered by *Amoco Oil Co. v. H. Grunewald & Co.*, 592 F.2d 745 (4th Cir. 1979), *rev'g H. Grunewald & Co. v. S.S. Ginevra*, 1978 AMC 886 (E.D.Va.1977). In that case, the district court relied on ullage figures rather than meter readings. The Fourth Circuit reversed, on the ground that the charter party specifically provided that measurement of the quantity of oil delivered would be determined by the agent/inspector jointly hired by the parties *either* by ullage or meter readings, and that under agency principles, plaintiff was bound by the agent's report, which was based on the meter readings. *Id.* 746–48. The charter party between Kerr-McGee and defendant does not contain a provision specifying that either ullage or meter figures may be used; it merely states that title passes to buyer at the vessel's permanent hose connection. Nor is there any provision in the charter party for appointment of a

joint appraiser. We thus find *Amoco, supra*, distinguishable from this case.

6. Defendant has questioned the accuracy of the meter readings based on the necessity to make periodic adjustments indicating that the meters themselves were not in a condition which would make their measurements reliable. However, plaintiffs point out that defendant's expert was able to attribute to this "meter factor" only a discrepancy of approximately 553 barrels and indicated a willingness to have the court make a deduction of that magnitude from its award. In addition, defendant's expert noted that meter adjustment factors are influenced by changes in the rate at which the oil flows through the pipeline. Thus, the evidence that there were variations in the rate at which the oil was pumped may account for the un-

As with the meter readings, absent more evidence with respect to the contents of the pipeline before entry of the cargo and the disposition of the cargo after it left the Libertad and the barges, BS&W readings taken 2½ or 3 miles from the point of delivery and after the cargo had left defendant's possession and control will not override the BS&W readings taken on the ship and the barges.

■ Having thus concluded that the ullage and BS&W readings taken aboard the Libertad and the barges govern plaintiffs' shortage claim, we must reject plaintiffs' claim, based on the meter and BS&W readings taken at the Sunoco Terminal, that there was a shortage of 15,404.98 barrels. However, as defendant acknowledges, the ullage figures, after taking into account the BS&W content and the amount remaining on board the barges, indicate a shortage of 1730.59 barrels or .39% of the shipment. As to this shortage, defendant has not established the applicability of any of the COGSA exemptions, see Nissho-Iwai Co. v. M/T Stolt Lion, 617 F.2d 907 (2d Cir. 1980), and plaintiffs should recover, unless we accept defendant's contention that we should recognize and adopt the industry's view of variances under .5% as de minimus and not recoverable.

Although there is evidence of an industry practice to accept a .5% tolerance, both in the settlement of claims and in arbitration, we decline to mandate acceptance of such a tolerance in this litigated dispute, in which the charter party makes no reference to a .5% tolerance. See Esso Nederland v. M. T. Trade Fortitude, 1977 AMC 2144, 2148 (S.D.N.Y.1977), aff'd without op., 573 F.2d 1296 (1977).[7] We thus find that a shortage of 1730.59 barrels has been established. Defendant having failed to establish the applicability of an exemption pursuant to 46 U.S.C. § 1304, see Nissho-Iwai, supra, plaintiffs are entitled to recover for the shortage of 1730.59 barrels.

■ Plaintiffs produced oral testimony that the cost of replacing the oil which was not delivered was $36.78 per barrel, based on the price it paid for its next shipment of oil. Although defendant contends that plaintiffs' evidence is insufficient, defendant has not come forward with any evidence of a different replacement cost or the value of the non-delivered oil. Although we would not normally impose this burden on the defendant, in view of the fact that the price of crude oil on a given date is readily obtainable, we find defendant's failure to produce evidence to rebut the $36.78 replacement cost significant. We conclude that plaintiffs are entitled to recover their actual loss, which is reflected by the replacement cost of $36.78 per barrel. See Internatio, Inc. v. M. S. Taimyr, 602 F.2d 49, 50–51 (2d Cir. 1979) (applying 46 U.S.C. § 1304(5)). Plaintiffs should therefore recover their replacement cost for the 1730.59 barrel shortage at $36.78, or $63,651.10.

OTHER CLAIMS

■ Plaintiffs major remaining claim relates to excessive dock time. This claim is predicated on the failure of the defendant to discharge the entire cargo within the time specifications set forth in paragraph 10 of the rider to the charter party. There was testimony that on one occasion, the discharge was halted because of a breakdown in the pump aboard the vessel. It further appears that the entire cargo discharge operation was more time consuming and difficult than would have been the case had the lightering not been required. These were precisely the costs which the plaintiffs sought to avoid by limiting the original cargo on the vessel.

Plaintiffs, not possessing the logs and other documentation which would indicate the precise discharge time and the extent to which defendants were responsible for delays (e.g. because of breakdowns of the

usual number of meter adjustments which were needed here.

7. But see Palco, Inc. v. American President Lines, 1978 AMC 1715, 1722 (D.Or.1978) ("Defendant's proof of an expected and normal loss of .5% rebuts plaintiff's prima facie case of unseaworthiness for that amount.").

ship's pumps) have made a rough estimate of normal dock time charges for unloading a cargo of this size. Defendants have not presented any alternative to plaintiffs' estimate of 6½ cents per barrel, although, as noted, defendants possess the relevant data. Plaintiffs' evidence with respect to excessive dock time was sufficient to impose some burden of rebuttal on defendant. We accept plaintiffs' estimate of $30,574.30 in excessive dock costs.

We likewise find plaintiffs entitled to the excess inspection costs ($2,155.98) and excess customs expense ($640) necessitated by the lighterage operation. However, we reject plaintiffs' claim for the cost of an otherwise unidentified surveyor sent by its insurance department to survey the loss, whose report appears not to have been required and in fact was not produced at trial or otherwise used in connection with this case.

In sum, plaintiffs shall have judgment for $202,896.38, being the sum of the following: $105,875 for barge costs; $63,-651.10 for cargo shortage; $30,574.30 for excessive dock time; $2155.98 for excess inspection costs; and $640 for excess customs expenses. Interest at the rate of 10%, as requested by plaintiffs, is granted as adequate compensation to plaintiffs. *See Noritake Co. v. M/V Hellenic Champion*, 627 F.2d 724, 728 (5th Cir. 1980); *Federal Barge Lines, Inc. v. Republic Marine, Inc.*, 616 F.2d 372 (8th Cir. 1980) (10%); *Sabine Towing and Transportation Co. v. Zapata Ugland Drilling, Inc.*, 553 F.2d 489 (5th Cir.) *cert. denied* 434 U.S. 855, 98 S.Ct. 175, 54 L.Ed.2d 127 (1977) (12%). The interest is to run from the date on which defendant failed to deliver the cargo. *See Mitsui & Co. v. American Export Lines*, 636 F.2d 807, 824–25 (2d Cir. 1981).

Settle order on notice within thirty (30) days.