### UNILEVER/LEVER BROTHERS (PTY) LTD., Plaintiff,

v.

### M/V STOLT SPUR, In Rem, et al., Defendants.

### Civ. A. No. H82–2389.

United States District Court, S.D. Texas, Houston Division.

Feb. 17, 1984.

---

Michael A. Orlando, Hinds & Meyer, Houston, Tex., for plaintiff.

William Seele, Julian & Seele, Houston, Tex., for defendants.

## MEMORANDUM AND ORDER

SINGLETON, Chief Judge.

### STATEMENT OF CASE

This is a cargo case over which this court has admiralty jurisdiction. 28 U.S.C. § 1333. Unilever/Lever Brothers (PTY) Ltd. ("Unilever") sues Parcel Tankers, Inc. ("Parcel"), the time charterer of the M/V STOLT SPUR, for the alleged short delivery of a cargo of U.S. inedible bleachable fancy tallow. The parties have waived a trial and submitted all their evidence in written form for a decision by this court.

The parties have stipulated to the following facts:

1. Plaintiff Unilever is the owner-shipper-consignee of the cargo in question and is thereby the proper party to bring this suit and recover damages should the court rule in plaintiff's favor.

2. Defendant Parcel was at all material times the time chartered owner of the M/V STOLT SPUR which carried the cargo in question. Said defendant is the "carrier" of Plaintiff's cargo, as that term is defined in the Carriage of Goods by Sea Act ("COGSA") and is thereby responsible to plaintiff for damages should the court rule in favor of plaintiff on the liability issues.

3. The M/V STOLT SPUR is a Liberian flag, motorized, tanker vessel whose port of registry is Monrovia. Said vessel's dimensions are 169.75 meters in length and 24.80 meters in breadth, with a gross registered tonnage of 14,912.

4. The M/V STOLT SPUR has 36 tanks for carriage of bulk cargoes: 13 starboard, 10 center and 13 port. Plaintiff's cargo was carried in Tank No. 1 Center.

5. A tanker bill of lading was issued on April 21, 1979 to plaintiff for carriage of 2,203,911 pounds = 999.687 metric tons of U.S. inedible bleachable fancy tallow. The bill of lading specifically incorporates COGSA, (46 U.S.C. §§ 1300–1315); the bill of lading is submitted as Exhibit A.

6. The bill of lading also incorporates a certain tanker voyage charter party dated April 12, 1979 between Parcel, as chartered owner of the vessel, and Lever Brothers Company, as charterer. This charter party is submitted as Exhibit B. Said charter party contemplated that a cargo of 1000 metric tons of tallow would be loaded.

7. The tallow was loaded at the Port of Houston at City Dock No. 1 West from storage tank No. 19. A copy of the vessel's Port Log is submitted as Exhibit C. Prior to loading, Thionville Surveying Company, Inc. ("Thionville") issued its survey certificate No. 2474 which certifies that after inspection the ship's tank was sound, free of contamination, and suitable for loading and transport of tallow. In addition, the survey states that the shorelines were clean, suitable for cargo handling, and empty before and after loading.

8. The bill of lading cargo amount was determined by Thionville weight certificate No. 2474, submitted as Exhibit E. Said determination was based on readings from the shore tank ullages. Defendant does

not stipulate to the accuracy of such calculations.

9. Once onboard, ullages were taken by vessel personnel. The cargo Tank No. 1 Center was measured to be 1007.352 metric tons. This is shown on the vessel's after loading ullage report, submitted as Exhibit F. Plaintiff does not stipulate to the accuracy of the ship's ullage readings.

10. The particular parcel of tallow at issue was loaded in Tank No. 1 Center. A copy of the stowage plan for all cargoes on the particular voyage is submitted as Exhibit G.

11. Based on the ship's logs, submitted as Exhibit H, during the voyage across the Atlantic the weather was uneventful.

12. Upon arrival in Durban, South Africa on May 26, 1979, the vessel's crew again ullaged the vessel's tank and made a before-discharge ullage report. This report states that there were 1002.483 metric tons of plaintiff's cargo in the number one center tank. Said report is submitted as Exhibit I.

13. The cargo was discharged into three shore tanks at Island View Storage in Durban. Island View Storage reports receiving only 965.732 metric tons of plaintiff's cargo, as reflected in the Certificate of Survey and outturn reports submitted as Exhibits J1 and J2.

14. An after-discharge certificate was issued for Tank No. 1 Center showing that said tank was empty and well swept. Said certificate was signed by the cargo interest's surveyor and is submitted as Exhibit K.

15. The value of plaintiff's cargo is stipulated to be $655.50 per metric ton. Attached as Exhibit L is Lever's invoice 462 which covers this shipment.

16. The parties stipulate that there is no evidence that any of the tallow cargo loaded into Tank No. 1 Center of the M/V STOLT SPUR was directed into any other ship's tanks, its bilges, or over the side of the vessel, other than the fact that there are discrepancies in the various measurements of plaintiff's cargo. In entering into this particular stipulation, defendant does not stipulate that the presence of any such discrepancy is probative evidence of any cargo being diverted into the ship's tanks or bilges or over the side of the vessel.

17. The parties stipulate that there is no evidence that the M/V STOLT SPUR was anything but seaworthy at the time of loading or throughout the voyage or that the vessel's officers and crew did not exercise the requisite due diligence in relation to the loading and voyage, other than the fact that there are discrepancies in the various measurements of plaintiff's cargo. In entering into this stipulation, defendant does not stipulate that the discrepancies noted are probative evidence of any unseaworthiness or lack of due diligence.

18. Plaintiff has no evidence of any negligence on the part of defendant in relation to the carriage of the tallow, except that the various measurements taken of plaintiff's cargo differ. In entering into this stipulation, defendant does not stipulate that the discrepancies noted are probative evidence of any negligence.

19. By calculation, .5% of the bill of lading figure would be 4.998 metric tons; 5% of the cargo as reflected in the after-loading ullages would be 5.037 metric tons.

20. Other exhibits attached hereto are: Exhibit M—Thionville Laboratories, Inc. manual or handbook on specific gravities; Exhibit N–M/V STOLT SPUR information publication; Exhibit O—Report of Maritime Surveys International, Inc.; Exhibit P—Excerpts from the cargo handling book of the M/V STOLT SPUR.

OPINION

By virtue of the specific incorporation of COGSA in the bill of lading, the provisions of the Act and case law interpreting it control the disposition of this case. Under COGSA, in order to establish a prima facie case, plaintiff must prove a claimed shortage by a preponderance of the evidence. *Kerr-McGee Refining Corporation v. M/V La Libertad,* 529 F.Supp. 78, 82 (S.D.N.Y. 1981); *see Spencer Kellogg, Division of*

*Textron, Inc.*, 703 F.2d 44, 46 (2d Cir.1983). After careful review of the stipulated facts, expert testimony,[1] and pleadings of counsel, this court finds that plaintiff has not met this burden.

Based upon the documents submitted as Exhibits A through R, the court has ascertained that the following pertinent events occurred: (1) On April 21, 1979 at 10:06 hours, the M/V STOLT SPUR docked at the City Dock No. 1 West, Houston, Texas; (2) Tank No. 1 Center, a phenolic coated tank, was inspected and approved at 11:35 hours; (3) the cargo of U.S. inedible bleachable fancy tallow was loaded between 11:55 and 17:05 hours into Tank No. 1 Center; (4) Tank No. 1 Center was sampled, ullaged, and calculated at 18:00 Hours; (5) on May 26, 1979 from 12:25 to 13:10 Tank No. 1 Center was again ullaged;[2] (6) on May 26, 1979, from 13:45 until 22:40 the cargo of tallow was discharged at Island View No. 2 Terminal, Durban South Africa, and (7) Tank No. 1 Center was inspected after discharge and found to be empty and well swept to the suction with one drum, approximately 380 pounds, of tallow remaining. The dispute between Unilever and Parcel centers on whether the shoretank calculations taken at Island View Storage in Durban or the before-discharge ullage measurements taken onboard the M/V STOLT SPUR determine the validity of Unilever's shortage claim. Plaintiff argues that the 965.732 metric ton figure as calculated at the Durban shoretank controls and seeks $23,000 compensation for the 33.955 metric ton difference between this shoretank figure and the 999.687 metric tons listed on the bill of lading. Defendant, on the other hand, urges this court to use the before-discharge ullage measurement of 1,002.438 metric tons which, when compared with the after-loading ullage measurements, reveals a loss of 4.869 metric tons.[3] In the event defendant is not found liable for the entire 33.955 metric tons, plaintiff seeks recovery for the loss of 4.869 metric tons, based on the vessel's own ullage figures.

■ Defendant relies on such cases as *Kerr-McGee Refining Corporation v. M/V La Libertad*, 529 F.Supp. 78 (S.D.N.Y. 1981); *Northeast Petroleum Corporation v. Prairie Grove*, 1977 AMC 2139 (S.D.N.Y. 1977); *Centerchem Products, Inc. v. A/S Redeveat Odfjell*, 1972 AMC 373 (E.D.Va. 1971) to support its position that shoretank measurements do not control in a cargo shortage claim. Plaintiff cites no cases to bolster its contrary contention. Shoretank calculations in bulk or chemical cargo cases generally are held to be insufficient to show a delivery shortage because shoretank facilities are located past the point of delivery of the ship's cargo to the consignee. *See, e.g., Kerr-McGee Refining Corporation*, 529 F.Supp. at 83; *Centerchem Products, Inc.*, 1972 AMC at 375–76. The point of delivery with bulk or chemical cargoes is generally the vessel's manifold or when the cargo passes from the vessel's permanent hose connections. *See id.* Paragraph No. 7 of the charter party in the instant case clearly contemplates that delivery would be taken by Unilever at the vessel's permanent hose connections:

> Pumping in and out. Hoses. (a) The cargo shall be pumped into the vessel at the expense, risk, and peril of the charterer, and shall be pumped out of the vessel at the expense of the vessel only so far as the vessel's permanent hose connections, where *delivery* of the cargo shall be taken by the charterer or consignee.

(Emphasis added.) Thus, by virtue of case law and the parties own charterparty, the shoretank measurements put forth by plaintiff are irrelevant to the shortage

---

1. The testimony of Captain Jacob ter-Meulen, defendant's expert in marine survey, was submitted to this court in the form of a deposition.

2. Contrary to plaintiff's assertion that there is no way to determine when the before-discharge reading was taken, this fact is ascertainable from the cargo handling book excerpts, submitted as Exhibit P.

3. As discussed below in this memorandum and order, defendant does not concede that there was in actuality a loss of 4.869 metric tons.

claim. To recover, plaintiff must show a shortage before the tallow passed the point of delivery. The reason for this rule is that once past the permanent hose connections, the vessel has no control over the disposition of the cargo; therefore, to require the carrier "to inspect a maze of piping and storage tanks over which it had no control or expertise would be burdensome if not impossible." *Centerchem Products, Inc.,* 1972 AMC at 375–76.

■ The question then remains whether plaintiff can show a loss of cargo before delivery. Comparing the after-loading and before-discharge ullage computations, there appears to have been a diminution of 4.869 metric tons. However, according to the testimony of defendant's expert in the field of marine survey, Captain Jacob ter-Meulen, there was no loss of cargo during ocean transport and no diversion of tallow upon discharge. This testimony is not countered by evidence on the part of plaintiff.

Captain ter-Meulen reviewed the pertinent documents relating to the loading and discharge of the tallow from which he prepared a report. He concluded that the discrepancy in amount between the two ullage figures resulted from the use of two different specific gravities.[4] According to Captain ter-Meulen when the same specific gravity is used for both the after-loading and before-discharge ullages, the figures are: after loading, 1007.352 metric tons; before discharge, 1008.234 metric tons. Captain ter-Meulen found that the specific gravity used to calculate the cargo weight after loading was taken from a Thionville handbook on specific gravities.[5] This handbook consists of tables of temperatures and their corresponding specific gravities for liquid cargoes, including bleachable fancy

tallow. At Houston, the temperature onboard in Tank No. 1 Center was 110° F; the corresponding specific gravity as listed in the Thionville handbook was 0.89778. From these figures a weight of 1,007.352 metric tons was derived. In Durban, the temperature in Tank No. 1 Center was 154° F. The specific gravity used for the ullage was 0.87691, which was not the specific gravity listed in the Thionville handbook as corresponding to 154° F. Captain ter-Muelen testified that, in order to determine correctly whether or not cargo was lost before delivery, it was necessary to be consistent and use the specific gravities from the Thionville publication for both the after-loading and before-discharge ullages. Using the Thionville handbook specific gravity figure of 0.88194, which corresponds to 154° F, 1,008.234 metric tons is obtained. This reflects an insignificant gain rather than loss of cargo. From these computations, Captain ter-Muelen concluded that the cargo that was loaded in Houston into Tank No. 1 Center was still there on arrival and before discharge at Durban.

In addition, Captain ter-Meulen testified that in his opinion all the cargo that was loaded on board the M/V STOLT SPUR was in fact discharged. None was diverted into another tank or over the side of the ship. He based his opinion on an analysis of the stowage plan of the cargo loaded on the M/V STOLT SPUR; the Certificate of Survey, which indicated that only one drum was left in the tank after discharge; the fact that the lines were well steamed out from the pump to the manifold; the diagram of the vessel's deck piping and pumps; and his own experience in the field of marine surveying. Plaintiff did not submit any expert testimony or evidence to refute Captain ter-Meulen's conclusions.

---

**4.** With a cargo such as tallow, the method of determining its weight is to first, measure its volume, then use a specific gravity at an observed temperature. Using these two figures, one can determine the weight at a certain volume.

**5.** Captain ter-Meulen determined that the Thionville handbook was the source of the 0.89646 specific gravity figure used in ullaging Tank No.

1 Center because it matched the 0.89646 figure given in the Thionville handbook as corresponding to a 110° temperature. By the same process, Captain ter-Meulen determined that the specific gravity figure of 0.89778, used to determine the weight of the tallow in storage tank 19 in Houston, was also taken from the Thionville handbook table.

Consequently, this court concurs with defendant's position in this case and finds on the evidence before it that plaintiff has not met its burden of establishing a loss of cargo prior to delivery. Thus, no prima facie case has been made.

Accordingly, for the reason given above, it is ORDERED, ADJUDGED, and DECREED that plaintiff is not entitled to recover from defendant. Judgment is to be entered for Parcel Tankers, Inc. Defendant is to submit a proposed final judgment within ten days from the date of entry of this Memorandum and Order in accordance with this court's findings.