SPENCER KELLOGG, DIVISION OF TEXTRON INC., Plaintiff,

v.

S.S. "MORMACSEA" and S.S. "Mormacvega," S.S. "Mormacwave", Her engines, boilers, etc.

v.

MOORE–McCORMACK LINES, INC., Defendant.

Nos. 80 Civ. 0492 (ADS), 81 Civ. 0849 (ADS).

United States District Court, S. D. New York.

April 22, 1982.

---

William R. Connor III, Bigham, Englar, Jones & Houston, New York City, for plaintiff.

James E. Ryan, Dougherty, Ryan, Mahoney, Pellegrino, Giuffra & Zanbito, New York City, for defendant.

MEMORANDUM OPINION AND ORDER

SOFAER, District Judge.

Plaintiff Spencer Kellogg, Division of Textron, Inc. ("Spencer Kellogg") commenced this admiralty suit to recover money damages from defendant Moore-McCormack Lines, Inc. ("Moore-McCormack") for the alleged short delivery of two shipments of castor oil, shipped from Recife, Brazil, to Brooklyn, New York. Plaintiff is the consignee of the cargo, which was sent in two shipments, one aboard each of the defendant vessels, S.S. MORMACVEGA and S.S. MORMACSEA. The goods were shipped by Soc. Alg. Nord. Brasiliero, S/A of Recife, Brazil ("SANBRA"). The parties to this action have waived their right to a trial. Instead, they have submitted all their evidence to the Court in written form and asked the Court to render judgment in accordance with the evidence submitted. The evidence submitted raises issues of fact that would have required a trial if summary judgment had been sought. But the parties have agreed that no witnesses will be called, perhaps because of the relatively small amount of money at stake. See Plaintiff's Letter of April 27, 1981; Defendant's Letter of May 7, 1981.

The castor oil shipped from Brazil in this case was loaded on defendant's vessel by SANBRA. Prior to loading, the tanks of both ships were inspected for tightness by the American Bureau of Shipping, an independent organization. In addition, at SANBRA's request, the Societe Brasileira de Superintendencia S.A. inspected the tanks and found them to be in a satisfactory condition for the carriage of oil. The oil was transported to the ship by truck. En route, the trucks were weighed at the Institute of Alcohol, an official agency of the Brazilian Government. To determine the weight of the oil placed on board, the trucks were weighed again after delivery, and this figure was subtracted from the original weight. These figures were given to the chief mates of the respective vessels who wrote them on the bills of lading that were issued by the ships.

Both ships eventually arrived in New York and discharged their cargo into the barge MANOLEINE, which was under contract with the plaintiff to receive the cargo. The cargo was then transported to and discharged into storage tanks partly at the Hudson Tank Storage Company in Weehawken, New Jersey, and partly at plaintiff's facilities in Edgewater, New Jersey. Plaintiff sues for alleged shortages on delivery, measured by the amounts that the bills of lading indicate were delivered to the carrier.

To establish a prima facie case of non-delivery of cargo under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. §§ 1300–1315 (1976), the cargo owner must prove that the carrier received the amount of cargo claimed but delivered a smaller amount. See, e.g., Vana Trading v. "S.S. Metto Sleon," 556 F.2d 100, 104–05 (2d Cir. 1977); Cummins Sales & Service, Inc. v. London & Overseas Insurance Co., 476 F.2d 498, 500 (5th Cir.), cert. denied, 414 U.S. 1003, 94 S.Ct. 359, 38 L.Ed.2d 239 (1973); Demsey & Assoc., Inc. v. S.S. Sea Star, 461 F.2d 1009, 1014 (2d Cir. 1972); M. W. Zack Metal Co. v. S.S. Birmingham City, 311 F.2d 334, 337 (2d Cir. 1962), cert. denied, 375 U.S. 816, 84 S.Ct. 50, 11 L.Ed.2d 51 (1963). COGSA provides that the "bill of lading shall be prima facie evidence of the receipt by the carrier of the goods as therein described." 46 U.S.C. § 1303(4) (1976). To establish the quantity of castor oil entrusted to Moore-McCormack, plaintiff has presented four bills of lading, which state that the carrier received 1,256,622 pounds (285,000 kilos) of castor oil on each vessel. In addition, plaintiff has provided further evidence of the quantity delivered by presenting the depositions of independent surveyors, certificates of inspection of the cargo, other documents prepared by Sociedade Brasiliero de Superintendencia S.A., handwritten tallies showing the amount loaded on board defendant's ships, and the depositions of the chief mates of defendant's ships.

Defendant contends that the bills of lading are not prima facie evidence of delivery to the carrier of the amounts stated, be-

cause the goods were in fact weighed by independent surveyors hired by the shipper and not by the carrier. Defendant points specifically to a disclaimer in the bills of lading, which states:

"WEIGHT OF CARGO DETERMINED BY A THIRD PARTY, AND ISSUANCE OF THIS BILL OF LADING SHALL NOT BE AN ADMISSION BY CARRIER THAT WEIGHT STATED IN THE BILL OF LADING IS ACCURATE."

Defendant's Trial Memorandum at 4.

The Second Circuit recently reaffirmed the established principle that a carrier may not avoid the evidentiary consequences of representations in a bill of lading by including disclaimers similar to the one in this case. In *Westway Coffee Corp. v. M. V. Netuno*, 675 F.2d 30 (2d Cir. 1982), the carrier issued an onboard bill of lading that listed the gross weight of containers filled with coffee but was also marked "Said to Contain (STC)," "Shipper's Load and Count," and "Contents of Packages Are Shipper's Declaration." Noting that carriers can readily check the weight of goods even though they are often unable to check their condition, the Court refused to permit such qualifications to vary the carrier's representation in the bill of lading about the cargo's weight. In a unanimous decision, Judge Newman wrote:

> Once the carrier lists the weight of the goods (which normally will be readily verifiable by the carrier), he represents that he has no reasonable ground for suspecting that the weight of the goods actually received varies from the listed weight and that he has reasonable means of checking the weight, 46 U.S.C. § 1303(3)(c) (1976). This is enough for a *prima facie* showing of receipt of the listed weight. 46 U.S.C. § 1303(4) (1976).

*Id.*, slip op. at 1737.

Defendant's attempt to disclaim is not materially different from those denied effect in *Westway Coffee*. The disclaimer here is somewhat longer, and it explicitly proclaims its intended legal effect. But the more pointed disclaimers in *Westway Coffee* and other, similar cases, could only have

been intended to have the same effect, *i.e.*, to make the shipper rather than the carrier responsible for the bill of lading's representation as to weight. *See, American Trading Co. v. The Harry Culbreath*, 187 F.2d 310, 313 (2d Cir. 1951); *Spanish-American Skin Co. v. The M.S. Ferngulf*, 143 F.Supp. 345, 349–50 (S.D.N.Y.1956), *aff'd*, 242 F.2d 551 (2d Cir. 1957); *George F. Pattinos, Inc. v. American Export Lines, Inc.*, 68 F.Supp. 759, 764 (E.D.Pa.1946), *aff'd*, 159 F.2d 247 (3d Cir. 1947). If in fact the shipper is responsible, because it delivered less than it represented to the carrier, Congress has provided that the carrier's remedy is an indemnity action against the shipper; the carrier may not normally negate its statutory guaranty of the accuracy of the shipper's measurements. *See* 46 U.S.C. § 1303(5); *Nitram, Inc. v. Cretan Life*, 599 F.2d 1359 (5th Cir. 1979); *Westway Coffee Corp. v. M. V. Netuno, supra*, at 1738.

Defendant in this case argues that the disclaimer in the bills of lading should be given effect, because it is the custom of the trade in castor oil in Brazil for the shipper to weigh the cargo. COGSA provides a limited authority for carriers effectively to disclaim responsibility for a representation as to the weight of cargo:

> Where under the customs of any trade the weight of any bulk cargo inserted in the bill of lading is a weight ascertained or accepted by a third party other than the carrier or the shipper, and the fact that the weight is so ascertained or accepted is stated in the bill of lading, then, notwithstanding anything in this chapter, the bill of lading shall not be deemed to be prima facie evidence against the carrier of the receipt of goods of the weight so inserted in the bill of lading, and the accuracy thereof at the time of shipment shall not be deemed to have been guaranteed by the shipper.

46 U.S.C. § 1310; *see* Defendant's Trial Memorandum at 6.

To take advantage of § 1310, the carrier must establish that there is a trade custom in which a third party is relied upon to determine the weight of the cargo. De-

fendant has submitted some evidence to this effect. It has established that both the shipments in this case were weighed by the Alcohol Institute of Brazil, and William Sheridan, the MORMACSEA's Chief Officer, testified that the typical procedure in such cases is for the shipper to provide the quantities stated in the bill of lading. *See* Deposition of William Sheridan Joint Exh. 17 at 12–15, 21–23, 32–33.[1] Even if this evidence is interpreted generously in favor of defendant, however, it is insufficient to establish a custom of the trade, because such circumstances are often present in cases where the consignee by custom in fact relies upon the carrier's representation. *See, e.g., Westway Coffee Corp. v. M.V. Netuno, supra,* at 1734 (weighing done by the shipper). One commentator has noted that third-party weighing is the trade custom in the coal and grain trades, and to some extent in the bulk oil trade. A. Knauth, *Ocean Bills of Lading* 181 (4th ed. 1953). But one cannot infer from that evidence that there is a similar trade custom in the transport of bulk castor oil.

■ The disclaimers in the bills of lading in this case include the statement that weight has been determined by a "third-party." Under COGSA, this should not be sufficient to put the consignee on notice that it cannot rely upon the weights stated in the bills. Given the importance of enabling consignees to rely upon carrier representations in bills of lading, and the fact that consignees must know that carriers commonly seek to disclaim their statutory duty to stand behind such representations irrespective of any custom, carriers should be required to make it clear in any disclaimer that they are at least claiming to rely upon a custom of the trade. A disclaimer purportedly based on a custom should be given effect only where the carrier states its claim that there is a custom of relying upon the weight stated by a specified third

party, and that the purported weight is that declared by the third party, not by the carrier. Here, the bills do not suggest reliance upon any such custom, the third party is not identified, and the weight is first given as the actual weight of the goods received and then separately disclaimed. Under these circumstances, the consignee is entitled to the protection Congress intended consignees normally to have.

■ Defendant has failed to show that the shortages were due to one of the exceptions listed in COGSA § 1304(2), or that it exercised due diligence in making the ship seaworthy and properly handled the cargo during transport. *See, e.g., Schnell v. The Vallescura,* 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373 (1934); *Madow Co. v. S.S. Liberty Exporter,* 569 F.2d 1183 (2d Cir. 1973); *American Tobacco Co. v. The Katingo Hadjipatera,* 81 F.Supp. 438 (S.D.N.Y.1948), *aff'd,* 194 F.2d 449 (2d Cir. 1951). Defendant contends it has met this burden with documentary evidence of inspections of the carrier's tanks by an independent surveyor, by the shipper's surveyor before the voyage, and by the plaintiff's surveyor just before discharge; the three inspections found the tanks to be fit. In addition, defendant's surveyor, after testing the tanks and inspecting the hull, found the tanks to be in good condition. The tanks were again inspected after discharge, and it was found that all the oil had been pumped out. Defendants therefore contend that the shortages were presumably due to inaccuracies in measuring the quantity of oil. Though impressive, defendant's evidence is insufficient to rebut plaintiff's case. The proof of delivery of the quantity stated remains substantial. Defendant's own surveyor, E. W. Saybolt & Company, Inc., measured the delivered quantity and found a shortage. Defendant was in the best position to avoid miscalculations in the measurements of the quantities of bulk cargo by being more diligent in ensuring that adequate measure-

---

1. In fact, defendant has not even alleged that in the bulk castor oil trade it is a custom for a third party to weigh the cargo. Any such inference in this case must be deduced from the few instances in the depositions where the subject is mentioned. *See* Joint Exh. 14, at 9–12, 27– 28; Joint Exh. 16, at 11–13, 15–16, 21–24, 36– 37, 42–43; Joint Exh. 19, at 11–14. When taken as a whole, however, this evidence is insufficient to establish that there is such a custom of trade in the transportation of bulk castor oil.

ments were taken. No one prevented defendant from taking its own measurements upon loading, and in fact, the defendants exercised their right to make such readings upon delivery to plaintiff. The carrier could readily have checked the weight of the oil through ullage measurements, or by measuring the flow of the oil as it entered the vessel's tanks.

Defendant has similarly failed to prove that it properly transported and cared for the cargo. *See* I. Hall, A. Sann, & M. Katzman, *2A Benedict on Admiralty* § 56 (7th ed. 1977). The tanks were in a proper condition for transporting the oil, but it has not been definitively established that defendants properly transported the bulk cargo. In cases of bulk cargo delivery shortage, the carrier is the only one in a position to explain what might have happened to the cargo during the voyage. Because defendant has failed to give an adequate explanation, it is liable for the shortage, as COGSA contemplates. *See Spencer Kellogg v. S.S. Mormaclynx*, No. 78–1289 (S.D. N.Y. Feb. 1, 1980) (appendix to Pl. Trial Memorandum).

Plaintiff has uncontrovertedly established that it received less castor oil than the quantities stated in the bills of lading, but precisely how much less is in dispute. Thus, plaintiff has provided, for each ship, three sets of figures for the quantity of castor oil: (1) on board the ship prior to discharge; (2) on board the barge MANOLEINE, into which the oil was pumped; and (3) delivered by the barge to storage tanks in New Jersey. The shortages indicated are:

### MORMACVEGA

| Quantity Shipped (lbs.) | Quantity Delivered (lbs.) | Net Shortage (lbs.) (less .5%) |
|---|---|---|
| 1,256,622 | 1,231,264 (on board) | 19,074.89 |
| | 1,234,598 (Manoleine) | 15,736.89 |
| | 1,237,565 (storage tank) | 12,773.89 |

### MORMACSEA

| Quantity Shipped (lbs.) | Quantity Delivered (lbs.) | Net Shortage (lbs.) (less .5%) |
|---|---|---|
| 1,256,622 | 1,231,250 (on board) | 19,088.89 |
| | 1,236,897 (Manoleine) | 13,441.89 |
| | 1,239,507 (storage tank) | 10,831.89 |

Plaintiff's Trial Memorandum at 8–15.

The question presented is what measurement the Court should use to determine the amount of the shortage. *See Schroeder Brothers, Inc. v. Saturnia*, 226 F.2d 147 (2d Cir. 1955). Normally, this depends on when defendant "delivered" the cargo to the plaintiff. In *Northeast Petroleum Corp. v. S.S. Prairie Grove*, 1977 A.M.C. 2139 (S.D.N.Y.1977), the defendant agreed to transport gas and diesel fuel, with the risk of loss remaining on the defendant until permanent hoses were connected to the ship. In determining whether the defendant was liable for an alleged shortage in the quantity of the cargo delivered, the Court stated:

as provided by the charter party, delivery occurred upon passage of the cargo from the vessel's permanent hose connections to connections provided for by plaintiff. Although the best evidence of the amount of cargo so delivered, i.e., passing through the permanent hose connection of the vessel, would be the actual total of the count of each barrel as it passed from the vessel's connections to plaintiff's coupled with the 'Dry Tank Certificates' absent this total, the Court finds that the next best evidence of the amount of cargo delivered to be those calculations taken by the [ship's] Captain and the [inde-

pendent surveyor] based on the joint ullage readings of the vessel's tanks upon arrival at each destination point.

*Id.* at 2142.

Likewise, in the present case "delivery" occurred when the defendant transferred the cargo oil to the MANOLEINE. Trial Exh. 1. As both parties have stipulated, "[t]he barge MANOLEINE is owned and operated by Manhattan Oil Transportation Corporation which was retained by Spencer Kellogg to receive the cargo from the vessel, S.S. 'MORMACVEGA.'" Stipulation of Fact, filed June 1, 1981.

A difficulty arises in this case, however. With each successive measurement, the amount of the alleged shortage has decreased. In *Northeast Petroleum*, the Court focused on the moment of delivery for determining the quantity shortage in order to protect the carrier, since "[t]o require the carrier to inspect a maze of piping and storage tanks over which it had no control or expertise would be burdensome if not impossible." 1977 A.M.S. at 2143 (quoting *Centerchem Products v. A/S Rederiet Oldfjell*, 1972 A.M.C. 373, 375 (E.D.Va. 1971)). In this case, to follow the *Northeast Petroleum* approach would prejudice defendant unfairly, because the subsequent cargo measurements evidenced less of a shortage.

■ The burden of proving actual damages is on the plaintiff. *See generally* G. Gilmore & C. Black, *The Law of Admiralty* § 3–43 (2d ed. 1975). All that plaintiff has done is present three different sets of figures for each shipment. These figures demonstrate a delivery shortage, but plaintiff has not explained why there is a discrepancy in the figures or why the subsequent measurements show a greater quantity delivered. The figures may reasonably be construed to indicate that the quantity measured in the storage tanks, which is the greatest amount and is also the quantity that the plaintiff was finally left with, is the most accurate delivery measurement on the facts presented. Given the fact that defendant has at least managed to show that uncertainty exists as to the amount of

cargo actually lost, it seems sensible absent other explanations to reduce the amount of cargo that was found unaccounted for by the cargo that is "found" after delivery is technically complete. Furthermore, the quantity of cargo that a consignee was actually able to sell or use is the fairest measure of damages, since any oil it is able to sell or use redresses its actual damages accordingly. Plaintiff has not even attempted to disprove that it was able to sell or use the amount of oil delivered to its storage tanks. The proper and fair net shortages for purposes of damages in this case, therefore, are the differences between the amounts reflected on the bills of lading and the amounts delivered to the storage tanks: 12,773.89 pounds on the MORMACVEGA and 10,831.89 pounds on the MORMACSEA.

■ The net shortages are 19,074.89 pounds (8.6523 metric tons) on the MORMACVEGA, and 19,088.89 pounds (8.6587 metric tons) on the MORMACSEA. Plaintiff's average price for the shipments was $869.71 per metric ton on the MORMACVEGA (based on average of the shipment prices for the two lots, which were $899.41 and $840) and $899.41 on the MORMACSEA. The total damages for the MORMACVEGA shipment are therefore $7,524.99, and the total damages for the MORMACSEA shipment are $7,787.69. In addition, plaintiff will be awarded prejudgment interest, which is normally granted in admiralty cases absent extraordinary circumstances. *See The Wright*, 109 F.2d 699, 702 (2d Cir. 1940). Such interest should start to run from the dates of delivery, September 24, 1977 for the MORMACVEGA and November 3, 1977 for the MORMACSEA, since, as the Second Circuit has noted:

The case law is overwhelmingly to the effect that, both in land and in sea carriage, prejudgment interest is ordinarily awarded from the time when destroyed or lost goods should have been delivered by the carrier. The theory underlying these cases is that interest on damages is

a form of compensation intended to make the injured party whole and that the plaintiff has not suffered any loss until the time when the goods should have been, but were not, delivered. To start the interest running at a prior date arguably would give the plaintiff more than he would have had if the contract had been performed, a result prohibited by a reasonable reading of the provision in § 4(5) of COGSA that [i]n no event shall the carrier be liable for more than the amount of damage actually sustained. *Mitsui & Co., Ltd. v. American Export Lines*, 636 F.2d 807, 824 (2d Cir. 1981) (Friendly, J.). The plaintiff is therefore entitled to prejudgment interest from the dates of delivery at a rate "measured by interest on short-term, risk-free obligations, a reasonable estimate of which is 12%. *Independent Bulk Transport, Inc. v. The Vessel "Morania Abaco"*, 676 F.2d 23 at 27 (2d Cir. 1982). Plaintiff is therefore awarded total damages of $15,312.68, plus costs and interest. The Clerk is instructed to enter judgment, and the case is hereby deemed closed.

With respect to the related case of *Spencer Kellogg v. S.S. MORMACWAVE*, 81 Civ. 849 (ADS), plaintiff is directed to prepare within ten days a proposed judgment consistent with the findings and conclusions in this case, accompanied by an explanatory affidavit. Defendants will have ten days thereafter in which to respond to the proposed judgment.

SO ORDERED.