**INSURANCE COMPANY OF NORTH AMERICA, Plaintiff,**

v.

**S/S "GLOBE NOVA," her engines, tackle, boiler, etc., the Globe Tankers, Globe Transport and Trading Company Ltd., Willow Grove Shipping Company Ltd., Gamma Shipping Co., Inc., Globe Tanker Services, Inc., Defendants.**

No. 84 Civ. 1928 (CBM).

United States District Court, S.D. New York.

May 19, 1986.

Yorkston W. Grist, P.C. by David L. Mazaroli, Richard Salz, New York City, for plaintiff.

Walker & Corsa by Hollis M. Walker, Jr., Vera E. Weinberg, Constantine Papas, New York City, for defendants.

## OPINION

MOTLEY, Chief Judge.

This is an action under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. Section 1300 et seq., for an alleged shortfall in a shipment of molasses from India to the United Kingdom. After a bench trial and consideration of the controlling law as well as of the evidence submitted by the parties, the court finds and concludes that plaintiff has made out a *prima facie* case for relief under COGSA, unrebutted by defendant and that, accordingly, plaintiff is entitled to damages. The court's findings of facts and conclusions of law are as follows:

## FACTS

Plaintiff, Insurance Company of North America, is the insurer of the shipment of molasses at issue in this case and brings this suit as subrogee of the insured parties. The insurance coverage was arranged through Namolco, Inc., a Delaware Corporation. The policy included coverage of Namolco, A.G., a Swiss Corporation, and International Molasses, Ltd., an English business entity, both subsidiaries of Namolco, Inc. Namolco A.G. was the FOB purchaser of the cargo and International Molasses, Ltd. was the receiver of the cargo.

Defendants are related companies engaged in ocean transport of cargo. During the period at issue in this action, defendant Gamma Shipping Company, Inc. was the owner of the S/S Globe Nova. Defendant Globe Transport & Trading Company, Ltd. was the vessel's chartered owner. Defendant Globe Tanker Services, Inc., also known as Globe Tankers, was the operating manager of the S/S Globe Nova at all relevant times. Defendant Willow Grove Shipping Company, Ltd., the charterer of the Globe Nova for the voyage in question, has never been served as a defendant in this action.

On March 29, 1983, The State Trading Corporation of India, a seller of molasses, made a delivery of molasses to defendants and the Globe Nova at the port of Bombay, India. This was done pursuant to a letter of credit arrangement with Namolco, A.G. and various banks. The cargo was weighed on board the Globe Nova by a draft survey technique, a method which compares the depth of the vessel in the water before and after loading. This Bombay draft survey indicated that the ship had received 15,522.778 metric tons of molasses, the same amount that the Indian seller had represented to defendants would be delivered. Defendant carrier at this time issued a negotiable on board bill of lading dated March 29, 1983 for 15,522.778 metric tons of Indian cane molasses of sound and merchantable quality.

From Bombay the Globe Nova sailed to Kandla, India. On April 3, 1983 the same seller, pursuant to the same letter of credit arrangement, delivered a quantity of molasses to the vessel at Kandla. This additional molasses was again weighed on board by a draft survey method. The draft survey here indicated that 3,429.478 metric tons of molasses had been loaded on board. As in Bombay, this was the identical amount as the seller had represented would be delivered to the ship at Kandla. Defendant carrier at this time issued a second negotiable on board bill of lading dated April 3, 1983 for 3,429,478 metric tons of

Indian cane molasses of sound and merchantable quality.[1]

The cargo was shipped from India to the United Kingdom pursuant to a charter party dated February 3, 1983 between defendant Globe Transport and Trading Company Ltd. as chartered owner of the Globe Nova, and Willow Grove Shipping Company Ltd. Clause Seven of this charter party reads in pertinent part:

> The cargo shall be pumped into the vessel at the expense, risk and peril of the Charterer, and shall be pumped out of Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its Consignee.

The bills of lading issued by the Globe Nova at Bombay and Kandla both incorporate the terms of the February 3, 1983 charter party between Globe Transport and Trading Company Ltd. and Willow Grove Shipping Co. Ltd. Besides setting forth the weight of the cargo as loaded on board, among other things the bills of lading state that the cargo is consigned "to order," that the "Freight [is] payable per Charter Party," and that "[t]he contract of carriage evidenced by this bill of lading is between the shipper, consignee and/or owner of the cargo and the owner or demise charterer of the vessel...." As per the charter party clause number eight, the freight was due and payable "[n]inety percent prepaid on telegraphic advice of signing Bills of Lading on the intake quality...."

The voyage of the Globe Nova from Kandla, India to its first discharge port at Felixstowe, England lasted approximately three weeks. Defendants offered no evidence regarding the nature or eventfulness of the Globe Nova's ocean transit. There was also little evidence as to the condition of the vessel other than that it had been built in 1964.

On April 25, 1983 the Globe Nova arrived at Felixstowe, England where the receiver of the cargo, International Molasses, Ltd. ("Intermol"), operated a shore facility. Upon the ship's arrival at Felixstowe, an Intermol employee conducted a draft survey of its cargo. Roughly half of the molasses on board was then discharged through offshore pipelines into Intermol's Felixstowe shoretanks located approximately 1250 feet from where the vessel was docked. This discharge lasted about three days. After it was complete another draft survey was taken of the amount of molasses remaining on board.

The vessel proceeded to a second Intermol facility at Hull, England where it arrived on April 27, 1983. Here the remaining molasses cargo on board was measured by draft survey, again by an Intermol employee. This molasses was then discharged into the Intermol shoretanks at Hull located about 1250 feet from the ship's docking point. The Hull discharge activities lasted about six days. Upon completion of this discharge a second draft survey of the ship's contents was made. The combined draft survey results at Felixstowe and Hull indicate with only a small amount of loss approximately the same figures arrived at

---

1. The relevant financial and shipping arrangements for the molasses purchase at issue in this case are as follows. The seller of the molasses, The State Trading Corporation of India, had entered into a letter of credit arrangement with Namolco, A.G. and various banks for the purchase of 20,000 metric tons of Indian cane molasses F.O.B., five percent plus or minus at buyer's option, at a set dollar amount. This was an irrevocable, unrestricted, without recourse to drawer letter of credit which specified that payment of 100% of the invoice value of the cargo would be made by Namolco's bank upon presentation of complete shipping documents, including the clean on board bills of lading. Each

of the two negotiable bills of lading issued at Bombay and Kandla mentioned the letter of credit pursuant to which the total shipment of 18,952.256 metric tons of molasses was purchased and shipped.

After the loading of the cargo on the "Globe Nova" and the issuance of the bills of lading, the bills of lading were presented to the banks. Payment was then made under the letter of credit in reliance on the total quantity of 18,-952.256 metric tons stated by the carrier in the two bills of lading. Accordingly, as provided in the letter of credit, and at the rate stated therein, Namolco paid 100% of the invoice price for 18,952.256 metric tons of molasses.

by the combined draft surveys in Bombay and Kandla, India—the surveys taken after the cargo had been loaded on board and that had formed the basis for the numbers stated in the two bills of lading. However, the general inaccuracy of the draft survey method *per se* is suggested by the 70 metric ton discrepancy between the draft survey estimate made after completion of discharge at Felixstowe on April 27, 1983, and that made by a somewhat different draft survey method prior to the commencement of discharge at Hull the same day.

The discharge activities themselves at both Felixstowe and Hull were uneventful in that there was no leakage or spillage from the lines that led from the vessel to the Intermol receiving tanks on shore. Upon termination of discharge at the second port, Hull, an Intermol employee inspected the vessel's tanks and issued a dry tank certificate representing that the tanks were empty and well drained for discharge purposes. Accordingly, the court finds that all of the cargo which passed the vessel's permanent hose connection was received in the shore tanks.

The Intermol shore tanks at both Felixstowe and Hull were equipped with precision molasses measuring devices called pneumercators. Pneumercators are used extensively in the molasses trade and had been used by Intermol since 1968. They operate by means of a delicately adjusted air chamber which communicates with a mercury gauge calibrated for the particular tank whose contents it is measuring. The pressure of the weight of molasses inside of the storage tank forces the mercury up the glass gauge tube. The mercury level is then read off on a Vernier Scale. Pneumercators, which may be used with shipboard tanks as well as on shore tanks, provide a more reliable and accurate method of measuring molasses than draft surveys can furnish. Draft surveys, though commonly used in cargo measurement, are comparatively crude in their technique and correspondingly give less accurate measures than pneumercators.

The Intermol shore tank pneumercator readings at both Felixstowe and Hull, each taken immediately upon receipt of the molasses discharged from the Globe Nova, indicated a 253 metric ton shortfall in the amount of molasses received as compared to the 18,952 metric ton amount to which Intermol was entitled under the bills of lading issued at Bombay and Kandla. The pneumercator readings showed that 9,074 metric tons of molasses were delivered at Felixstowe and 9,625 metric tons at Hull, for a total delivery of only 18,699 metric tons. Intermol reports setting forth a total delivery to the shore tanks of only 18,699 metric tons were based on these pneumercator readings and did take into account the molasses in the pipeline leading from the Globe Nova to the storage tanks at each port.

The pneumercators at the Intermol shore tanks at both Felixstowe and Hull were properly maintained and were in good working order at the time the Globe Nova shipment was calculated. The outturn quantity of 18,699 metric tons of molasses as set forth in the detailed Intermol delivery reports from Felixstowe and Hull accurately reflects the quantity of molasses delivered by defendants through the permanent hose connections of the S/S Globe Nova.

At both Felixstowe and Hull, notations were made by Intermol representatives on the reverse side of each bill of lading stating the respective outturn quantities as measured in the shore tanks. On May 3, 1983 at the completion of the Globe Nova's entire cargo discharge upon the accomplishment of the Hull shore tank delivery, Intermol presented a Notice of Claim to the vessel's agent. This claim was for the non-delivery of 253 metric tons of molasses, as indicated by the combined shore tank pneumercator readings at the Intermol facilities.

Damages for the non-delivery of molasses by defendants to Intermol shall be calculated according to the following facts. The molasses purchase shipped on the Globe Nova was made in order to fulfill

Intermol's existing resale obligations rather than as inventory. The 253 metric tons of molasses that were not delivered would have been sold in accordance with the Intermol Product price list which reflects the product's sound market value at the time of the molasses' discharge from the Globe Nova. Accordingly, the value of the cargo not delivered to Intermol by defendants was $48,502.62. Defendants have offered no evidence placing plaintiff's proof of damages into question.

Plaintiff Insurance Company of North America filed this suit on its own behalf as subrogee of the insured Namolco interests, as well as on behalf of the shipper, consignee, and owner of the cargo in question. INA's insured adopted and ratified the pursuit by INA in this litigation of the damages due in excess of INA's insurance payment of $27,950. The average prime rate of interest prevailing between the date of the disputed cargo's discharge in England in May 1983 and April 10, 1985 was at least 11.35% per annum.

DISCUSSION

██ Plaintiff, as subrogee of the consignee of a shipment of Indian cane molasses, brings this suit for non-delivery of cargo pursuant to the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. 1300 et seq. Under COGSA a consignee establishes a *prima facie* case against a carrier simply by demonstrating full delivery of the cargo to the carrier in good condition, and outturn of the cargo in damaged condition or less than the amount due. *Spencer Kellogg v. S/S Mormacsea*, 703 F.2d 44, 46 (2d Cir.1983); *Westway Coffee Corp. v. M.V. Netuno*, 675 F.2d 30, 32 (2d Cir.1982). Once the consignee proves its *prima facie* case, the burden then shifts to the carrier to show that the loss or damage demonstrated falls within one of the COGSA exceptions set forth in 46 U.S.C. Section 1304. See *Westway Coffee Corp., supra* at 32.

A. *Delivery of Goods to the Carrier.*

██ The first half of plaintiff's *prima facie* showing that a discrepancy exists between the amount of cargo delivered to the carrier and the amount of cargo discharged consists, of course, of a showing that the carrier fully received the cargo in good condition initially. Plaintiff can usually rely on the carrier-issued bill of lading to make this first half of his showing because the bill of lading, itself, supplies *prima facie* evidence of the cargo's weight and other characteristics upon delivery. 46 U.S.C. Section 1303(4); *Westway Coffee Corp. v. M.V. Netuno*, 675 F.2d 30, 32 (2d Cir.1982). Although a clean bill of lading attesting to the apparent good order and condition of the cargo will not constitute a *prima facie* showing of the cargo's good condition where the manner of packing allows for the possibility of concealed, internal conditions that were not apparent to the external observer, see *Caemint Food, Inc. v. Brasileiro*, 647 F.2d 347, 352 (2d Cir.1981), weight is a different matter. Once a carrier lists the weight of the goods on the bill of lading, and especially if there is a ready means of verification or if a verification has been made, he represents that he has no reasonable ground for suspecting that the weight of the goods actually received varies from the listed weight. See 46 U.S.C. Section 1303(3)(c).

██ Furthermore, a carrier is bound by its bill of lading representations concerning cargo quantities received on board regardless of whether any misstatements by it of the quantity were fraudulent or intentional. See *Berisford Metals Corp. v. S/S Salvador*, 779 F.2d 841, 847–48 (2d Cir. 1985). Similarly, whether or not a carrier has actually received on board the cargo represented in its bill of lading, absent some indication on the bill of lading signaling the non-receipt of the cargo or a portion thereof, a carrier is estopped from disclaiming receipt of the goods. *Berisford Metals Corp. v. S/S Salvador*, 779 F.2d 841, 845–49 (2d Cir.1985); *General Foods Corp. v. The Felipe Camarao*, 172 F.2d 131 (2d Cir.), *cert denied*, 337 U.S. 908, 69 S.Ct. 1047, 93 L.Ed. 1720 (1949); *Van Ekris & Stoett, Inc. v. S.S. Rio Paraguay*, 573 F.Supp. 1475, 1479 (S.D.N.Y. 1983).

In view of the status of bills of lading as negotiable documents, and the fact that they are heavily relied upon by buyers in arranging for payment via letters of credit, the importance of holding a carrier to the representations made in a bill of lading should be obvious. See *Berisford Metals Corp. v. S/S Salvador*, 779 F.2d 841, 845–48 (2d Cir.1985); *Van Ekris & Stoett, Inc. v. S.S. Rio Paraguay*, 573 F.Supp. 1475, 1478 (S.D.N.Y.1983). As recently stated by the Second Circuit in a decision holding a defendant carrier liable for non-delivery of goods which indisputably were never delivered to the carrier in the first place, "the necessity for maintaining the integrity of and confidence in bills of lading has been recognized by us in a line of cases beginning before and continuing after the 1936 enactment of the COGSA." *Berisford Metals, supra* at 845. "[A] negotiable or order bill of lading is a fundamental and vital pillar of international trade and commerce, indispensable to the conduct and financing of business involving the sale and transportation of goods between parties located at a distance from one another." *Id.* The *Berisford* court went on to describe the commercial realities behind bills of lading. "The carrier, by issuing the bill, enables the seller to collect full payment of the purchase price from the buyer since presentation of the bill to the buyer assures it that the seller has fulfilled its commitment to ship the goods and obligates the buyer to pay for them." *Id.* at 847. If the parties to the transaction were free to question the accuracy of the bill upon presentation, the entire structure of maritime commerce would be weakened. *Id.*

### B. *Outturn of Goods from the Carrier.*

In the instant case the two bills of lading issued by the Globe Nova at Bombay and Kandla unequivocably indicate a quantity of 18,952.256 metric tons of Indian cane molasses loaded on board. Defendant has made no attempt to rebut plaintiff's *prima facie* case that this was the amount received by the vessel or the true amount to which Intermol, at the other end of the voyage, was entitled. Instead, defendants argue that plaintiff has failed to make a *prima facie* case of entitlement to relief under COGSA because it has not proved a shortfall of cargo upon receipt. According to defendants, the draft survey figures taken on board the Globe Nova at Felixstowe and Hull are the figures to which the input figures listed on the bills of lading should be compared. If, instead of the pneumercator figures offered by plaintiff, these on board survey figures are used to show outturn, the discrepancy between cargo delivered and cargo received would be negligible and plaintiff would thus have failed to make its *prima facie* case.

Defendants' argument for using the draft survey figures instead of the pneumercator figures to determine the actual molasses outturn at the Globe Nova destinations in the United Kingdom has two aspects. One turns on defendants' contention simply that it is unfair to compare figures taken by two different techniques. A discrepancy between draft survey figures and pneumercator figures reflects a discrepancy of method rather than of substance, and because it does not necessarily indicate any actual cargo loss, argue defendants, it is irrelevant to plaintiff's case. The second aspect of defendants' claim that the draft survey figures taken upon arrival at the British ports rather than the pneumercator figures should govern this dispute hinges on where and when the outturn measurements should be taken, on board the vessel prior to discharge, or in the shoretanks just after discharge. Defendants contend that since the bill of lading figures on which plaintiff relies to make the first half of its *prima facie* case were taken on board the Globe Nova, the outturn figures should also be based on the on board survey readings.

Both aspects of defendants' argument for using the British draft survey figures rather than the pneumercator figures are at first glance extremely appealing intuitively. Upon closer inspection, however, they collapse. Defendants' ultimately ill-placed confidence in these arguments is very understandable in light of their strong

superficial appeal, and perhaps explains their rather remarkable failure to offer any rebuttal evidence whatsoever to plaintiff's *prima facie* showing of COGSA liability.

### a. *What is the proper measure of a metric ton of molasses?*

Defendants argue first of all that because in India draft surveys were used in arriving at the total figure of 18,952.256 metric tons stated on the bills of lading, it is inappropriate to use pneumercator measurements at outturn to discern a shortfall. As defendants point out, the draft survey calculations taken in England indicated that the amount of molasses on board the Globe Nova prior to discharge in England was quite close to the amount indicated on the bills of lading. Accordingly, the argument continues, because there is substantial evidence that *no* discrepancy between the actual amount of molasses loaded and the amount actually on board the ship prior to delivery in fact existed, there is no liability under COGSA.

This court has found that a comparison of the draft survey figures from loading in India with the dockside draft survey figures in England indeed reveals that no significant loss of cargo occurred during the voyage of the Globe Nova. This fact is inadequate, however, odd though it may seem at first blush, to relieve defendants from liability for plaintiff's cargo loss. This is because the court also finds that whether or not an actual physical loss occurred, at receipt of the cargo in England there was nonetheless a shortfall from the amount listed on the bills of lading.

It is easy to understand why such a result—finding defendants liable regardless of whether an actual loss occurred while the cargo was in their possession—is initially disconcerting. One of COGSA's most salient policies is to remove from the shipper the risk for vessel defects, and by placing it onto the carrier, the party with the stronger bargaining power, to encourage carriers to maintain seaworthy vessels and to properly handle and care for the cargo in their custody. See 46 U.S.C. Section 1303(1), (2); *Wirth Ltd. v. S/S Acadia Forest*, 537 F.2d 1272, 1279 (5th Cir.1976), *rehearing denied* 541 F.2d 281, 282 (5th Cir.1976); *Cameco, Inc. v. S.S. American Legion*, 514 F.2d 1291, 1300 (2d Cir.1974). In this case there is scant evidence that anything was amiss in defendants' maintenance of the vessel or its cargo during the ship's voyage from India to England. Indeed, it seems not unlikely that had defendants made any effort to rebut plaintiff's *prima facie* case by invoking the exceptions to liability set forth in 46 U.S.C. Section 1304(1) and (2), they would have had a possibility of prevailing. Defendants could have attempted such a rebuttal either by showing their due diligence in maintaining a seaworthy ship under Section 1304(1) or by showing pursuant to Section 1304(2)(i) that the shortfall in cargo stemmed from an act or omission of the shipper or owner of the goods. This latter showing, had it been made, would most likely have consisted of evidence that the amount of molasses delivered to the ship in India was not in fact 18,952.256 metric tons but rather fell significantly short from that amount.[2] Ac-

---

**2.** Had defendants attempted the second of these rebuttals, i.e., that the amount of molasses delivered to the Globe Nova was not in fact 18,952.-256 metric tons, they would have had a difficult route to success. Any argument that the shipper or owner of the goods was at fault for supplying to the carrier an apparently inaccurate account of the goods to be shipped might be quite vulnerable if it is defendants themselves and not the shipper or owner who are responsible for the inaccurate draft surveys taken on board the Globe Nova in both Bombay and Kandla and which formed the basis for the bills of lading issued in these ports. See 46 U.S.C. Section 1304(2)(q) (persons claiming ben-

efit of exception to liability under 46 U.S.C. 1302(2) have burden of proving that neither actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage). If the defendant carrier was responsible for these measurements, this might also compromise his indemnification rights against the shipper under Section 1303(5) of COGSA which provides for carrier indemnification where inaccuracies in a bill of lading are caused by inaccuracies in the figures furnished by the shipper. It is noteworthy in mentioning the possibility of carrier indemnification rights here, that even if the carri-

cordingly, one suspects that had defendants presented any evidence on either the vessel's condition or on their care and/or responsibility for the cargo as listed on the bills of lading, they would have been able to demonstrate that during the ocean carriage here at issue, they offended neither of the important COGSA interests of carrier responsibility for seaworthiness nor of carrier responsibility for proper handling of cargo.

The ruling in favor of plaintiffs in this case, however, is not based on an affirmative finding that defendants actually lost cargo entrusted to it, but rather, simply on plaintiff's success in making an unrebutted *prima facie* case under COGSA. Plaintiff has shown a discrepancy between the amounts recorded on the bills of lading and the amount of cargo delivered, as measured by the shoretank pneumercator readings which the court has decided give the truest indication of actual outturn. See *infra* at 1422–25. While it is the court's sense that the real cause for this discrepancy was probably an initial inaccuracy in the bill of lading figures due to the crudeness of the measurement techniques used in Bombay and Kandla, this possibility is irrelevant to plaintiff's ability to make out a *prima facie* case under COGSA. Whether any molasses cargo was in fact lost during the India to England voyage of the Globe Nova, once a discrepancy between the bill of lading amount and the amount delivered to the buyer or consignee has been established, a carrier is still liable for non-delivery to the buyer—even if the goods had never made it onto the ship in the first place. See *Berisford Metals Corp. v. S/S Salvador*, 779 F.2d 841 (2d Cir.1985) (carrier liable for full amount of cargo listed on carrier-issued bill of lading despite fact that part of this amount was never loaded on board and despite carrier's lack of knowledge or intent of the shortfall, where carrier's representations about cargo involved observations within its power as opposed to representations involving latent conditions not within its power or duty to inspect).

This result should not be surprising once it is remembered that besides its policies favoring carrier responsibility to maintain seaworthy vessels and to handle cargo properly, just as centrally, COGSA embodies extremely important policies encouraging the use and reliability of ocean bills of lading. See *supra* pp. 1419–20. See also 46 U.S.C. Section 1303(3), (4); *Robert C. Herd & Co. v. Krawill Machinery Corp.*, 359 U.S. 297, 301 (1959); *Berisford Metals Corp. v. S/S Salvador*, 779 F.2d 841, 845–49 (2d Cir.1985); *Encyclopaedia Britannica, Inc. v. S.S. Hong Kong Producer*, 422 F.2d 7, 11–12 (2d Cir.1969). The deference given to bills of lading in the COGSA scheme, as evidenced by the weight they are given in the making out of the first half of a claimant's *prima facie* case, see *supra* at 1419–20, is merely one aspect of the COGSA's overall aim to enforce carrier accountability for the representations made on bills of lading.

What is at stake in the instant case is precisely the reliability of carrier issued bills of lading. If the draft surveys taken in Bombay and Kandla resulted in figures that did not accurately reflect the amount of cargo actually on board, the parties who paid money based on these figures as listed on the bills of lading should not be the ones to bear the loss. This comports quite squarely with the general policy under COGSA to provide protection for the shipper in light of the greater bargaining power of the carrier as the issuer of the bill of lading. See *Standard Electrica, S.A. v. Hamburg Sudamerikanische Dampfschiffahrts-Gesellschaft*, 375 F.2d 943, 945 (2d Cir.1967), *cert. denied* 389 U.S. 831, 88 S.Ct. 97, 19 L.Ed.2d 89 (1967).

Thus the fact that a particular method of measurement was used in arriving at the bill of lading figures is irrelevant to the question of which method should be

er could prove entitlement to indemnification from this shipper under Section 1303(5), this would "in no way limit his responsibility and

liability under the contract of carriage to any person other than the shipper." 46 U.S.C. Section 1303(5).

used to measure outturn. The consignee is entitled to receive the amount of cargo listed on the bill of lading, plain and simple. Accordingly, the fact that a draft survey method was used to measure delivery in India is no reason to prefer a draft survey method at outturn. The symmetry of defendants' argument is satisfying, but its logic is not. To require the same method of measurement at both delivery and outturn could, in a particular case, simply boil down to a presumption in favor of tipped scales at both ends. Clearly this is not where we want to end up. The desire for symmetry appealed to by defendants is misplaced where what the court must decide is simply which outturn measurement, whether because of its technique or its timing, in fact provides the most accurate reflection of actual outturn. Accordingly, defendants' first argument for rejecting the use of plaintiff's pneumercator figures for measuring outturn and for establishing plaintiff's *prima facie* case must fail.

b. *What is the proper measure of actual cargo discharge, pre-discharge figures or post-discharge figures?*

■ The second aspect of defendants' argument against plaintiff's use of pneumercator figures to make its *prima facie* case for cargo loss goes to the proper time and locus for measuring the cargo outturn. Since the bill of lading figures derive from measurements taken on board the vessel, argue defendants, the outturn figures should correspondingly be derived from the on board measurements taken prior to discharge at the British destinations. According to defendants, the argument is more than an aesthetic one. Under the terms of the relevant charter party for this voyage, which was incorporated by reference into the bill of lading, the carrier's responsibility for the cargo extended "only so far as the Vessel's permanent hose connection, where delivery of the cargo shall be taken by the Charterer or its Consignee." Thus, defendants should not be liable for any loss occurring in the ship-to-shore pipeline itself, or any loss attributable to shoretank

malfunction or to any other event occurring once all the cargo had traversed the ship's manifold.

Defendants have cited numerous cases relying on onboard cargo measurements at the port of destination to assess cargo outturn for purposes of determining whether plaintiff has made out its *prima facie* case under COGSA, and which squarely reject the proposal that the consignee's post-delivery shoretank figures be used instead. See, e.g., *Unilever/Lever Brothers Ltd. v. M/V Stolt Spur,* 583 F.Supp. 139, 1984 A.M.C. 2486 (S.D.Tex.1984); *Wesco International v. M/V Tide Crown,* 1985 A.M.C. 189 (S.D.Tex.1983); *Kerr-McGee Refining Corp. v. M/V La Libertad,* 529 F.Supp. 78 (S.D.N.Y.1981); *Dow Chemical Co. v. S.S. Giovannella D'Amico,* 297 F.Supp. 699 (S.D.N.Y.1971); *Centerchem Products, Inc. v. A/S Redereit Odfjell,* 1972 A.M.C. 373 (E.D.Va.1971). Under the facts of all these cases the carrier's contractual liability extended only to the vessel's manifold. Accordingly, as far as concerns the parties' agreed upon liability, they present factual situations quite comparable with the present case.

Central to the rationale in many of the above cases for using on board pre-discharge measures rather than shoretank post-discharge measures was the observation that pipeline connections are often extensive and complex, are beyond the carrier's knowledge, and in any event are beyond its responsibility. See, e.g., *Centerchem Products, supra* at 375. Accordingly, to allow a COGSA plaintiff to use shoretank outturn figures to make its *prima facie* case under the statute might end up rendering the carrier liable for events or losses that occurred after the cargo was in fact beyond the carrier's control and responsibility.

There is no question in this case that under the obligations of the charter party as incorporated in the bill of lading, defendants should not be liable for any cargo loss occurring after the molasses cargo had ful-

ly passed from the Globe Nova into the ship-to-shore pipelines off the coasts of Felixstowe and Hull. The outturn figure that must be used in determining whether plaintiff has made its *prima facie* case under COGSA are thus clearly those figures best reflecting the amount of molasses that actually passed beyond the permanent hose connection of the Globe Nova. The question remains however, which calculation—the pre-discharge calculation taken on board prior to discharge, or the post-discharge calculation taken in the consignee's offshore cargo tanks—is in fact the best reflection of the amount actually discharged.

Temporally and physically, the legal discharge point occurs between the time and place of the on-board cargo survey and the time and place of the post-delivery survey. Thus, unless a cargo measurement is made right at the edge of the vessel's permanent hose connection at the very moment of discharge, there is always a possibility of inaccuracy. There will be a discrepancy between the amount calculated in the on-board cargo measurement and the cargo actually discharged if, for example, between the time of the on-board survey and actual discharge, an explosion rips through one of the vessel's cargo tanks or if a small barge comes up alongside and siphons off an interesting quantity of cargo. Conversely, there will be a discrepancy between the actual discharge amount and the amount measured in the shoretanks if subsequent to passage through the permanent hose connection, a hose springs a leak and an offshore spill occurs, or less innocently, if some unsavory character himself draws off a bit of the valuable cargo from the shoretank before the shoretank measurements are registered.

A further obvious possibility for deviation of either the on board survey or the shoretank measurement from the amount of cargo actually discharged lies in the measurement technique. If the on board figures are flawed due to the reader's poor eyesight or the crudeness of the measure-ment technique used, such that they fail even to state accurately the amount of cargo present at the moment it is being measured, these figures will, of course, also be inadequate indications of the amount of cargo actually discharged through the ship's permanent hose connection a short while later. The same would be the case if the shoretank figures were flawed due to misreading or to primitive technique, and thus not truly reflective of the cargo amount actually measured in the shoretank much less of the amount that had just been discharged from the vessel.

In each of the cases cited by defendants for the proposition that on board figures rather than shoretank calculations should be used in establishing plaintiff's *prima facie* case, *supra* at pp. 1422–23, it was found that under the facts presented, the on board pre-discharge measurements most accurately reflected the amount of cargo actually discharged; thus they were the most appropriate figures for plaintiff to use in setting up its *prima facie* case under COGSA. Other tribunals, however, in determining whether plaintiff has made out its *prima facie* case under COGSA, have taken plaintiff's shoretank figures as most accurately reflecting the amount of cargo actually discharged from the vessel at its legal delivery point at the ship's manifold. See, e.g., *Spencer Kellogg v. S.S. Mormacsea,* 703 F.2d 44 (2d Cir.1983) (*affirming* 538 F.Supp. 230 (S.D.N.Y.1982)); *Amoco Oil v. M/V Lorenzo Halcoussi,* 1984 A.M.C. 1608 (E.D.La.1983) [Available on WESTLAW, DCTU database]; *Palmco, Inc. v. American President Lines, Ltd.,* 1978 A.M.C. 1715 (D.Or.1978).

In this case, the court has determined that it is the shoretank pneumercator figures, rather than the on board draft survey figures prior to discharge that best reflect the amount of cargo actually passing through the ship's manifold at Felixstowe and Hull. Unlike in the cases cited by defendant, all of which involved petroleum cargos and on board amounts based on

ullage figures,[3] the on board measurements in this case were arrived at through draft surveys, a method which this court has found to be significantly less reliable than the pneumercator technique. Moreover, the court is somewhat troubled by those cases cited by defendant in that while they justly consider the possibility that cargo losses may occur between discharge and shoretank receipt, they fail adequately to consider the possibility that losses may also occur between on board cargo measurement and actual discharge of the cargo. There is nothing intrinsically more reliable about on board figures as compared to shoretank figures. Their reliability, just as with shoretank figures, depends on the amount of time between measurement and actual discharge, as well as on the complexity of the route the cargo must travel between measurement point and discharge point and the likelihood of intervening diversions of cargo. It should be noted, moreover, that in those cases preferring the on-board figures to the shoretank figures, the COGSA interest in the carrier's maintenance of a seaworthy vessel takes center stage, while the statute's crucial purpose to promote the reliability of bills of lading is completely lost from view. But see *Westco International v. M/V Tide Crown*, 1985 A.M.C. 189, 197 n. 8 (S.D.Tex. 1983). By focussing on the probability of actual cargo loss through some fault of the shipper in deciding that it would be inappropriate to allow plaintiff to use shore tank figures in making its *prima facie* case, these decisions tend to bypass the COGSA burdens of proof favoring the shipper. Similar is their tendency to ignore the fact that whether or not cargo loss in fact occurs, a carrier may still be liable for failing to deliver what it promised in the bill of lading.

In contrast, those decisions allowing plaintiff to use shoretank figures to estab- lish the amount of cargo discharged, involved, as does this suit, situations where the court affirmatively found that the shoretank figures rather that the pre-discharge on board figures provided the best evidence of how much cargo was actually discharged from the vessel. For example in *Amoco Oil v. Lorenzo Halcoussi*, 1984 A.M.C. 1608 (E.D.La.1983) because the carrier's on board figures at both loading and discharge were based on inaccurate measurements, shoretank figures were used to determine discharge. In *Spencer Kellog v. S.S. Mormacsea*, 703 F.2d 44 (2d Cir.1983), storage tank figures rather than on board figures were used where accurate on board figures simply were never made. Similarly, in *Palmco, Inc. v. American President Lines, Ltd.*, 1978 A.M.C. 1715 (D.Or.1978), an extremely well reasoned case giving due cognizance to the important COGSA policies regarding bills of lading, the court decided after a careful assessment of the relative reliability of the two different measurement techniques used on board and on shore to look to the offshore figures as most accurately reflecting the amount of cargo actually discharged.

In the instant case, the court's determination that the shoretank figures should be used to establish the cargo outturn in the United Kingdom is based on its factual finding that, in general, pneumercator measurement of large quantities of molasses is far more accurate than measurement accomplished by the older and less technically sophisticated draft survey method. Significantly, plaintiff presented unrebutted evidence that the shoretank pneumercators at both Felixstowe and Hull were well maintained and in good working order at the time of the calculations in question. Thus, all things being equal, the pneumercator figures are a more reliable reflection than

---

**3.** Ullage is the distance from the top of a tank down to the surface of the cargo. The weight of the cargo is determined by first ascertaining the cargo's volume. The volume is arrived at by comparing the known volume of the tank with the volume of empty space in the tank above the cargo line. See *Dow Chemical Co. v. S.S. Giovannella D'Amico*, 297 F.Supp. 699, 707 (S.D.N.Y. 1969).

the draft survey figures of the amount of cargo actually discharged from the Globe Nova. Additionally, plaintiff has offered evidence that no cargo loss occurred after the molasses had passed from the ship on its way through the hose connections to the shore. Defendant has offered no evidence to place in doubt the court's conclusion that there was no cargo loss between shipside and shore or in the shoretanks themselves, if in fact any occurred at all. Thus there is no reason to suspect that the pneumercator figures might be skewed by cargo losses occurring in the shore pipeline between the time of discharge from the vessel and receipt into the shoretank.

Accordingly, the court having found that in this case plaintiff's shoretank figures are a more accurate indication of the amount of cargo discharged from the Globe Nova than the on-board draft survey figures, plaintiff has clearly established its *prima facie* case under COGSA. As indicated in the bills of lading, 18,952.256 metric tons were or should have been received on the vessel in India. As indicated by the pneumercator readings at Felixstowe and Hull, 18,699 metric tons were outturned by the vessel in England. This discrepancy is by itself adequate to make out a *prima facie* case under COGSA. Because defendants have offered no evidence to rebut this *prima facie* case, they are liable to plaintiff, as subrogee of the consignee in England, for the non-delivery of 253 metric tons of molasses.

## DAMAGES

Plaintiff is entitled to damages based on the fair market value of the cargo loss at discharge. *Interstate Steel Corp. v. S/S Crystal Gem*, 317 F.Supp. 112, 121 (S.D.N.Y.1970). As insurer, plaintiff is entitled to recover the amount it paid out to its assured, as well as the balance of the damages for and on behalf of its assured

Namolco. See *Insurance Company of North America v. S/S Italica*, 567 F.Supp. 59, 63 (S.D.N.Y.1983). Furthermore, plaintiff is entitled to prejudgment interest at the average prime rate, see *Mitsui & Co., Ltd. v. American Export Lines, Inc.*, 636 F.2d 807, 824 (2d Cir.1981); *Delphinus Maritime Limitation Proceeding; Mari Boeing*, 1982 A.M.C. 796, 812 (S.D.N.Y. 1982), from the date of discharge to present. *Mitsui & Co., Ltd. v. American Export Lines, Inc., supra* at 823.

## CONCLUSION

Plaintiff having made out a *prima facie* case of defendants' liability under the Carriage of Goods by Sea Act, unrebutted by defendants, plaintiff is entitled to recover in full the value of the non-delivered cargo to the cargo's receiver, Intermol, Ltd. The court finds defendant liable for non-delivery of 253 metric tons of molasses at a total value of $48,502.62 Plaintiff is award pre-judgment interest at a rate of 11.35% from April 27, 1983 to April 10, 1985. The parties are directed to submit findings to the court concerning the average prime rate of interest between April 10, 1985 and the date of this judgment so that the court may determine the rate of the additional pre-judgment interest to be awarded.