**FORTIS CORPORATE INSURANCE, S.A., Plaintiff,**

v.

**M/V CIELO DEL CANADA, and M/V California, in rem, and Italia Di Navigazione SpA, Buss Hansa Umschlagsgesellschaft mbH, and Juist Shipping GmbH in personam, Defendants.**

**No. 02 CIV. 8987(GEL).**

United States District Court,
S.D. New York.

Jan. 12, 2004.

David T. Maloof, Maloof Browne & Eagan, LLC, Rye, N.Y. (Thomas M. Eagan, of counsel), for Plaintiff.

Edward A. Keane, Mahoney & Keane, LLP, New York, N.Y. (Garth S. Wolfson, of counsel), for Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

LYNCH, District Judge.

Plaintiff, as subrogee of the consignee of a shipment of dried lentils and peas from

Canada to Peru, sues the carrier of the shipment for the total loss of the cargo, allegedly due to sea water contamination of the containers during the voyage. Defendant carrier concedes liability for a portion of the loss, but contests the amount of damages, arguing that only a portion of the loss was caused by the leakage of the containers. It contends that plaintiff's subrogor failed in its duty to mitigate damages, causing the remainder of the loss by its failure, following delivery of the cargo and the discovery of the problem, to separate the wet, contaminated portion of the shipment from the portion that was still dry and salvageable, leading to the total loss of the shipment. A bench trial was held on December 16, 2003. Verdict will be entered for the plaintiff in the claimed amount. The following constitute the Court's findings of fact and conclusions of law.

### FINDINGS OF FACT

Except where otherwise noted, the following findings were stipulated to by the parties at the beginning of trial.

1. Plaintiff, Fortis Corporate Insurance, S.A. ("plaintiff" or "Fortis"), is a corporation organized under the laws of Belgium and with its principal place of business in Antwerp, Belgium. Plaintiff is engaged in the business of maritime insurance, and issued a marine cargo insurance policy covering loss or damage to the cargo that is the subject of this action ("cargo"). (Pl.Ex. 45).

2. Plaintiff brings this action as the subrogated insurer of Frutos y Especias S.A.C., consignee ("Frutos y Especias" or "consignee") of Maviga N.A., Inc. ("Maviga" or "shipper").

3. Defendant Italia di Navigazione SpA ("Italia" or "carrier") is the operator of the M/V California. Italia is and was, at all material times, an ocean carrier.

4. Plaintiff paid the consignee $58,067.21 after the shipper filed a claim for damage to the subject cargo while it was in the custody and possession of defendant. (Pl.Ex. 35.)

5. On January 20, 2002, Italia issued four bills of lading (Pl.Exs.3–6) to the shipper for the carriage of a shipment of lentils and peas from Regina, Saskatchewan, to Callao, Peru (with the Port of Loading listed as Vancouver, British Columbia, and the Port of Discharge as Cartagena, Colombia), to be delivered to the consignee, as follows:

(a) Bill of lading VN200807 re: six 20 foot containers each containing 470 poly bags each weighing 100 pounds of Canadian Larid lentils in good order and condition.

(b) Bill of lading VN201231 re: six 20 foot containers each containing 470 poly bags each weighing 100 pounds of Canadian white yellow peas in good order and condition.

(c) Bill of lading VN200783: re: six 20 foot containers each containing 470 poly bags each weighing 100 pounds of Canadian whole green peas in good order and condition.

(d) Bill of lading VN200973 re: six 20 foot containers each containing 470 poly bags each weighing 100 pounds of Canadian Eston Lentils in good order and condition.

(Stipulated Fact 1.) [1]

6. The cargo was in good order and condition upon delivery to the carrier.

---

**1.** As noted above, virtually all of the facts described here were stipulated to, with the Court's encouragement, on the record at the outset of trial. Citations to "Stipulated Facts" in this recitation are to the stipulations

(Stipulated Fact 1.) In addition, the following documents were issued demonstrating the cargo was in sound condition—clean bills of lading, commercial invoices, weight certificates, quality certificates, and phytosanitary certificates. (Pl.Exs.1, 3–22.)

7. The cargo was transported from Vancouver, British Columbia, to Cartagena, Colombia, aboard the M/V Cielo del Canada. In Cartagena, the containers were discharged and loaded on board the M/V California.

8. At some point en route from British Columbia to Callao, Peru, seawater entered six containers of the peas and lentils. These six containers were marked CRXU 255635–8, CRXU 217165–4, CRXU 203153–9, CRXU 256384–5, CRXU 256856–6 and CRXU 104909–2. (Pl.Ex. 31.)

9. Defendant carrier admits it is responsible for damage caused by the seawater that entered the hold(s) of the vessel(s) and contaminated the containers. (Stipulated Fact 5.) Defendant disputes amount of damage as result of that event.

10. The containers were discharged from the M/V California on February 13, 2002, in Callao, Peru. On that day, the surveyor for the carrier discovered watermarks on the sides of the containers at a height of approximately 60 cm (about 24 inches). The containers' side panels were deformed "because of what appear[ed] to be inflated cargo." The carrier's surveyor stated that the condition of the cargo "would indicate that the cargo had been exposed to water for more than just a brief period of immersion." (Pl.Ex. 31 at 4.) The vessel notified the shipper about the wetting of at least part of the cargo on February 13, 2002.

11. Following discharge of the cargo, the containers were taken to the Tramarsa

Customs Warehouse ("Tramarsa"). The parties dispute the identity and role of the owners of the warehouse. The dispute about the name of the owner is essentially immaterial: Whether the owners were technically Tramarsa or Ransa, the testimony in the record makes clear that Tramarsa and Ransa are related entities and that the constituents of the local shipping industry referred to the two entities interchangeably. Like the witnesses, the Court will refer to the warehouse owner as "Tramarsa." More relevant is the question whether Tramarsa was or was not an agent of defendant. Defendant denies the fact, and asks the Court to take judicial notice of websites and other material listing other entities as defendant's agents in Peru.

■ Plaintiff's contention, however, is more soundly based in the trial evidence. First, the Court declines to take judicial notice that someone other than Tramarsa was, at the time, defendant's agent in Peru. Current websites maintained by the defendant cannot be taken as controlling evidence of the facts that existed in early 2002. Moreover, the question is not, "who is designated as defendant's overall shipping agent in Peru?," but rather, "was Tramarsa acting on behalf of the defendant in connection with this matter?" A principal can have multiple agents, and its designation of a general agent does not contradict the possibility that another person or entity was acting on its behalf for a particular purpose at a given time in connection with a specific transaction. Second, both contemporaneous surveyors' reports, which were admitted into evidence without objection, identify Tramarsa as agents for defendant. This is true not only of the report of the plaintiff's surveyor, Marconsult S.A.C. ("Marconsult") (Pl. Ex. 27 at 6), but also of that of defendant's

entered before trial as part of the Joint Pre– Trial Order.

own surveyor, Intersea S.R. Ltda. ("Intersea") (Pl.Ex. 31 at 8), which identifies Tramarsa, represented by one Manuel Purisaca, as "vessel Agents."[2] Tramarsa was independently identified elsewhere in the records as an agent of defendant. (Trial Decl. of Clive Mackay Talbot, sworn to Dec. 3, 2003 ("Talbot Trial Decl."), ¶ 7.) Third, Marconsult's surveyor on the scene, Ismael Carranza Ruiz, who testified at trial, also stated that the Intersea surveyor, Washington Reynaga, who was concededly acting on behalf of defendant, introduced himself as working for Tramarsa. Accordingly, to the extent relevant, the Court finds that Tramarsa was an agent of the defendant.

12. On February 16, 2002, a surveyor appointed by the shipper, Ismael Carranza of Marconsult, attempted to attend a survey at the Tramarsa Customs Warehouse in Callao, Peru. Carranza was not permitted entry by the guard. (Trial Decl. of Ismael Carranza Ruiz, sworn to Dec. 3, 2003 ("Carranza Trial Decl.") ¶ 6.) On the same date, Italia's surveyor, Intersea, *was* permitted entry, and inspected the outside of the six containers. Intersea noted:

(a) A water mark on the outside of the containers indicating inundation in about 60 to 80 cm of water.

(b) A slight deformation of the container sides, which was eventually established to be due to swelling of the cargo inside. The damage did not appear to affect the container structurally.

(c) A liquid smelling of fermentation dripping through the doors.

(d) The door gaskets were worn and in some cases broken.

(Pl.Ex. 31 at 8.)

13. On February 18–19, 2002, Marconsult and Intersea surveyed the cargo.

Representatives from the Tramarsa warehouse were also present. The surveyors counted and physically examined each bag taken from the six containers.

14. The surveyors determined that 807 of the 2820 sacks were classified as being 100% wet and moldy. The remaining 2013 sacks appeared dry.

15. A significant factual dispute exists concerning the state of the apparently dry portion of the cargo. It is agreed that there was no apparent water damage to over two-thirds of the beans. The survey reports do not identify any defect in this material, and defendant emphasizes that the contemporaneous notes of the Marconsult surveyors describe the dry sacks as in "good order" or "in apparent good order" ("en buenas condiciones" or "en aparente buenas condiciones" in the original Spanish.) (Pl.Ex. 27 at 23, 27, 28, 31, 35.)

Plaintiff's witnesses, however, tell a different story. Ismael Carranza, the head of the surveying team for Marconsult, testified at trial that the bags had a distinct and repulsive odor. Carranza was emphatic that he detected this odor not simply in the containers generally or in the vicinity of the wet sacks, but specifically in the dry sacks, of which a large number were opened and subjected to olfactory examination. Defendant notes, correctly, that any such odors should have been, but were not, described in Marconsult's survey report, and argues that Carranza's testimony is therefore unworthy of belief. However, Clive M. Talbot, Marconsult's General Manager and Carranza's supervisor at the time, rebuts the notion that Carranza's testimony is an after-the-fact fabrication

---

**2.** The Intersea report identifies this individual as "M. Purisaca." Marconsult identifies him as "Manuel Purizaea."

for litigation purposes, testifying unequivocally that Carranza told him at the time of the unpleasant odor. Talbot's testimony corroborates Carranza's testimony that he detected a foul odor emanating from the dry sacks.

The credibility of these witnesses is a critical question for the resolution of the case, and it is a close one. Defendant points out that the very purpose of a survey in maritime practice is to provide an objective account of the condition of the cargo at the time of delivery, and that it is the duty of the surveyor to examine the cargo with all senses, and to describe objectively what he or she has observed. The failure of the survey report to describe the dry sacks as smelly, and the description of those sacks in the notes of Carranza and his fellow surveyors as "in apparent good order" thus count tellingly against the credibility of Carranza's trial testimony. Any arguably prior statement of a witness that was inconsistent with his trial testimony would detract from the witness's credibility, and, as defendant correctly argues, these reports are not just any prior inconsistent statement, but are statements made for the very purpose of documenting observations such as those that Carranza claims to have made.[3] Moreover, as witnesses who were retained by the plaintiff to inspect the cargo in plaintiff's interest, the witnesses could be considered biased in plaintiff's behalf.

Nevertheless, despite these factors counting against their credibility, on balance the Court credits the testimony of Carranza and Talbot. First, the Court rejects any imputation that their testimony was affected by bias. While Marconsult was retained in this matter by plaintiff, and, according to Talbot, is frequently engaged by plaintiff in matters of this kind, Talbot's testimony makes clear that Marconsult seeks business from all sorts of constituents of the maritime trade, and is also retained by carriers including defendant. Talbot himself is an experienced surveyor and longtime participant in maritime insurance matters, with a reputation for integrity to maintain. Whatever interest Marconsult's representatives might have in upholding the claims of its clients in a particular (and rather small) matter is likely outweighed by their greater interest in maintaining a reputation for honesty in their business dealings.

Second, based on the witnesses' demeanor and responses on cross-examination, the Court found both witnesses credible. Assessing Carranza's credibility was more difficult, as the witness testified in Spanish through an interpreter; the Court is insufficiently fluent in Spanish to evaluate any clues to credibility that would normally be found in nuances of expression. In addition, Carranza was a stolid witness who appeared to have difficulty understanding the subtleties of some of the questions put to him, and occasionally gave non-responsive answers that in the Court's estimation indicated not evasiveness but difficulties of comprehension (despite what appeared to be precise and highly competent translation). But Carranza was definite and unshakable in his account of what he perceived. To the extent his testimony reflected any intellectual limitations, such limitations were consistent with the possibility that he failed to note in writing what he observed with his senses. Nothing in his manner, however, indicated any limita-

---

3. Defense counsel expressly disavowed any argument that survey reports are conclusive of the condition of cargo as a matter of law, arguing only—but forcefully and, in the Court's view, correctly—that they should be given great weight in evaluating the credibility of surveyor witnesses who testify in a manner arguably inconsistent with the contemporaneous survey reports.

tion on his ability to perceive odors, or any deceitfulness on his part in describing what he had perceived. Talbot, in contrast, testified in English, which is his native language. He appeared entirely forthright, and appropriately indignant at any imputation that he would shade his testimony. The Court found him an impressive and highly credible witness, prepared to acknowledge mistakes but straightforward in giving his recollection of events at the time.

Third, defendant also had surveyors on the scene, but failed to produce them to counter Carranza's observations. In its post-trial submissions, defendant urges the Court not to draw an adverse inference from this failure, noting the expense of producing witnesses from Peru in relation to the limited amount in controversy, and defending its reliance on the absence of any indication of a bad odor in the survey reports. As finder of fact, however, the Court disagrees, and elects to draw an adverse inference. As noted above, the Court has taken the reports themselves into account, both as substantive evidence (though noting that their value on this point is somewhat inferential, as the reports do not expressly deny any odor from the dry sacks, but merely can be read as indicating by omission the absence of odor), and as they bear on the credibility of the Marconsult witnesses. The Court is sympathetic to the issue of litigation expense. However, the parties have chosen, for whatever reason, not to settle this rather modest matter, and to expend considerable sums on both sides in litigating it. Whatever reasons there might be to doubt Carranza's testimony that there *was*

an odor, defendant has failed to produce any of the witnesses to the event, several of them clearly within defendant's control, to testify that there *was not.* In light of the expenses the parties did undertake in litigating this matter, the failure to produce witnesses to testify concerning the principal factual dispute at trial counts heavily, in the view of this finder of fact, against defendant.[4]

Finally, the presence of such an odor is consistent both with the expert testimony in the case and with common sense. Defendant's own surveyor, Intersea, noted the presence of a "very strong" smell emanating from the containers when they were discharged to the piers. (Pl.Ex. 31 at 4.) Intersea reported that further examination of the containers disclosed a "liquid smelling of fermentation" dripping from them. (*Id.* at 8.) As Intersex pointed out, the smell, coupled with the fact that the steel containers were partially "deformed" due to the inflation of the cargo "would indicate that the cargo had been exposed to water for more than just a brief period of immersion." (*Id.* at 4.) Plaintiff's expert, Kenneth S. Marsh, whose expertise in food packaging and contamination was well-established, and who appeared to the Court a highly credible witness, testified in response to questioning by the Court that dried legumes such as those in the present cargo were highly permeable to odors. Marsh also testified that the packaging material used for the sacks was intentionally not airtight, and thus was no barrier to the transmission of odors. It thus appears entirely likely that food products of this kind, exposed for a lengthy period to

---

4. The Court notes that the legal resources expended surely exceeded the amount in controversy. The parties have vigorously litigated the matter, retaining experts, conducting discovery and trial, and submitting reams of paper including replies and surreplies on the most inconsequential aspects of the case. In the context of this willingness to expend considerable sums on matters of marginal import, the cost of bringing a percipient witness to testify on a crucial matter of fact appears less significant than it otherwise might.

their rotting neighbors in the confines of a steel container, would absorb the kind of odors Carranza testified to detecting.

For all of these reasons, the Court finds that at the time of the delivery of the cargo, the contents of the dry sacks as well as those of the immersed ones exhibited a distinct and unpleasant smell.

16. Following the survey, the cargo was restowed in the bags in which they had arrived, and the bags, both spoiled and dry, were replaced in their original containers and stored in the Tramarsa warehouse. Some efforts were made to separate the dry from the wet bags, by the use of plastic covers or sheeting material between them. Nevertheless, the decision to replace the dry cargo in the same container with the wet appears counter-intuitive. It is clearly arguable, and defendant in fact argues, that whatever hope there might have been for salvaging any of the peas or lentils that had not been directly water-damaged was undermined by replacing them in something very similar to the conditions that arguably had already ruined them, rather than more completely separating the dry from the wet and storing the dry bags under conditions more propitious for their conservation. Accordingly, the parties devote considerable effort to disputing who made that decision and for what reasons. Plaintiff contends that officials of the Tramarsa warehouse (whose actions, plaintiff argues, are attributable to defendant) insisted upon this resolution, either because the cargo, not having cleared customs or having been approved for entry by Peruvian food inspectors, could not legally be altered from its arrival condition, or because they feared contamination of other products in the warehouse. Defendant, as noted above, disputes the claim that Tramarsa was its agent, and argues that in any event no legal obstacle prevented plaintiff's representatives from directing separate storage of the wet and dry sacks, and that plaintiff's customs agent either made the decision to keep the products where they were or at a minimum concurred in a suggestion to that effect made by Tramarsa.

The record does not permit a conclusive resolution of this issue. Defendant offers an affidavit from a Peruvian attorney, Dr. Francisco Area Patifio, on questions of Peruvian law. (Def. Ex. HH, sworn to June 26, 2003 ("Arca Aff.").) Under Fed. R.Civ.P. 44.1, the Court may use whatever materials are relevant and persuasive in determining a question of foreign law, whether or not such materials are admissible in evidence. Thus, the Court has admitted and considered the affidavit of Dr. Arca, over plaintiff's objection that the expert should have been produced to testify in person and be subject to cross-examination. While the affidavit is thus available for consideration, the Court finds it of less use than live testimony might have been. The issues in case appear to have shifted over time, and it is not clear that Dr. Arca's affidavit opined on the specific legal issues faced by the parties under the circumstances the Court has now found existed, or addressed all the sources of law that might have been relevant to the parties' contentions. Thus, in the absence of live testimony, the relevance of Dr. Arca's testimony, or the limitations and qualifications that may be applicable depending on the specific circumstances, cannot be assessed.

Both parties agree on the relevance of two provisions of Peruvian law, set forth both in Dr. Arca's opinion and in the Intersea survey report (Pl.Ex. 31 at 10–11). These provisions, however, are somewhat contradictory, or at least are subject to varying interpretations. On the one hand, Article 97 of Section III of Supreme De-

cree No. 121–96–EF provides that "merchandise in customs warehouses can be subjected to operations such as change, transfer and repair of packaging necessary for [its] conservation [among other purposes]." While this provision appears to support defendant's argument that no legal command required that the materials be placed back in their original containers pending customs inspection, it must be noted that Article 97 (both in the original Spanish ["podrán ser objeto de . . . cambio . . . de envases necessarios para su conservación"] and in the translation quoted above) is phrased in the passive voice. Thus, while it indicates that it is permissible rather than prohibited to change packaging, it does not indicate who is authorized to make that decision. Article 49 of Section IV of the same decree, in contrast, provides that "[d]uring the storage of merchandise, [its] owners or consignees can, with just the authorization of the responsible warehouse person, submit them to usual and necessary operations for its better conservation." This provision cuts against any argument that Tramarsa was legally precluded from authorizing different storage for the dry sacks; it does not, however, support the argument that the consignee could have directed conservation measures to be taken without the consent of the warehouse ("almacén"), that is, Tramarsa.

Resolving the more purely factual dispute about whether it was Tramarsa or plaintiff's customs agent who insisted on repackaging the cargo into the containers is again hampered by the absence of live testimony on behalf of the defendant. Intersea's report suggests that it was the customs agent who argued that "by law the cargo had to be re-stowed back into

the same containers." (Pl.Ex. 31 at 10.) Carranza testified, in contrast, that the Tramarsa warehouse representative directed that all of the cargo including the obviously damaged bags, be re-stowed in the containers, (Carranza Trial Decl. ¶ 10.) The Intersea report, unlike the testimony offered by plaintiff, was not subject to cross-examination to determine more precisely the nature of the conversation in which the customs agent's reported remark occurred or its relation to any position taken by Tramarsa.

Taking all of this information into account, the Court concludes, by a bare preponderance of the credible evidence and taking into account the various gaps in the evidence supporting each side, that a consensus developed among those concerned that the cargo should be restowed in its original containers. This decision was, at a minimum, concurred in by plaintiff's representatives on the scene. It apparently was influenced by what may have been a misunderstanding of Peruvian law on the subject, as well as by the concerns of Tramarsa that the entire cargo was suspect, and that storing *any* of it, wet or apparently dry, in proximity to other merchandise in the crowded warehouse could lead to contamination of other products.

17. On February 22, Marconsult sent the shipper a preliminary report suggesting among other things that the "six containers be dispatched to final warehouse as soon as possible to avoid any further cargo contamination due to length of stay at holding warehouse and to avoid drastic changes in temperature during this time of year." (Def. Exs. A & B.) Talbot repeatedly urged his clients to take steps to better conserve the cargo, but nothing was done.[5] At one point, Talbot expressed the

---

**5.** On February 22, 2002, Talbot e-mailed Marconsult's preliminary report to Maviga, recommending as "very important" that the con-

signee dispatch the containers to the final warehouse as soon as possible to avoid further deterioration. (Def.Ex. B). On February

opinion that "[i]nitially we could have guaranteed that over half of the cargo within the containers could have been saved [had the cargo been segregated]." (Def. Ex. C, e-mail from Talbot to Fortis dated March 6, 2002. *See also* Talbot Trial Decl. ¶ 8.)[6]

18. On March 4, 2002, SENASA (the agency of the Peruvian government responsible for public health and inspection of food imports) issued a Certificate of Rejection (destruction) of all the cargo in the six containers (2,820 bags) because it had determined the cargo to be "in bad sanitary condition" at a SENASA inspection conducted on February 26, 2002. (Pl. Ex. 33.) Defendant questions the date of this document, pointing out that after that date Marconsult continued to urge steps to salvage the cargo and that the condemned bags were not actually destroyed until April, and arguing that documents are often backdated in Peru. The record contains no actual evidence that the certificate was backdated, or that official Peruvian documents should be disregarded, and while Talbot's March 6 e-mail supports a possible inference that the fate of the cargo was not finally determined as of that date, that evidence could also be explained by Talbot's simply not having received notice of SENASA's decision. The Court thus finds the official document the most reliable source for the date of the condemnation of the cargo.

19. Following the issuance in late March 2002 of a formal "Intendancy Decision" by the Peruvian customs agency regarding the condemnation, the condemned

bags were destroyed on April 5, 2002. (Ex.34; Talbot Trial Decl. ¶ 10.)

### CONCLUSIONS OF LAW

█ Under the Carriage of Goods by Sea Act ("COGSA"), a cargo owner establishes a prima facie case of liability against a carrier upon showing receipt of the cargo by a carrier or his agents in good condition at the port of shipment and delivery in damaged condition at the port of destination. *Transatlantic Marine Claims Agency v. M/V OOCL Inspiration*, 137 F.3d 94, 98 (2d Cir.1998).

█ In this case, there is no question that the cargo was loaded in sound condition. The Court concludes, moreover, based on the findings of fact above, that the cargo was discharged in damaged condition. It is undisputed that this is established, and indeed that defendant is liable for damages, with respect to the approximately 30% of the cargo that was found to be wet and moldy at the time of delivery. Defendant contends, however, that plaintiff has failed to establish a prima facie case that the remaining bags were damaged at the time of arrival. The Court rejects this argument, finding that it is based on too narrow an interpretation of "damaged." The *entire* cargo, including the apparently dry bags, was exposed to seawater through the carrier's fault. The containers in which the cargo was packed were found to contain substantial quantities of seawater, a fact for which defendant bears responsibility. That the seawater only rose to a particular level, and thus

26, 2002, Talbot e-mailed Fortis, expressing his concern that given climactic conditions in Lima, "the cargo [condition] could easily become worse if not separated shortly and aired." (Def.Ex. C.)

**6.** Whether this was a serious opinion on Talbot's part, or merely, as he suggested at trial, an effort to instill a sense of urgency to do

something about the problem, the Court finds that Talbot did not have the requisite expertise in either the conservation of food products or the inspection standards of the Peruvian authorities to give any real weight to his opinion on the potential for salvaging the contents of the dry sacks.

that the bags above that level were not visibly wet, fermented, or moldy, does not compel the conclusion that the dry bags were therefore delivered in sound condition. It is undisputed that these bags of food for human consumption were, due to defendant's fault, packed for an indefinite period at sea in a container with rotting, fermenting food products that gave off a foul stench. For the reasons set forth in detail above, the Court finds that the legumes contained in most or all of the dry bags had themselves taken on this odor. Thus, even if the upper bags were dry and were not obviously completely spoiled, they were not in sound condition.

Even assuming arguendo that it would have been possible, absent subsequent mishandling of the cargo, to salvage some part of the product for animal feed (as is suggested in Intersea's survey report), or for some other use, such that its value was not completely destroyed, a food product that has been found to be foul smelling is necessarily not in sound condition. Its value is reduced, and the likelihood that it will ever be fit for its intended purpose, or for any other, is speculative. Such a cargo cannot be considered delivered undamaged just because it is dry, not otherwise damaged, and not (like the bags on top of which it has sat in the confines of its containers) a moldy, fermented mash.

Moreover, the *entire* cargo was ordered destroyed by Peruvian health authorities, within two weeks of its arrival. Although this fact does not in itself demonstrate that the entire cargo would have been condemned at the time of unloading, or that some of the cargo could not have been salvaged if proper steps had been taken, it both corroborates the conclusion that the cargo suffered damage as a result of the carrier's fault, and establishes that the wetting of the cargo for which defendant is responsible was at least a but-for cause of the loss of the entire shipment. No competent evidence in the record (discounting Talbot's off-hand and inexpert suggestion that part of the cargo could have been saved) supports a conclusion that foul-smelling lentils or peas would have been accepted by Peruvian health authorities as fit for human consumption or for any other use. Thus, while it is reasonable to conclude that the cargo was in worse condition when SENASA examined and condemned it on February 26, 2002, than it was when it arrived in Peru on February 13, the Court cannot find on this record that it would have been acceptable on the earlier date. Accordingly, plaintiff has established, by a preponderance of the evidence, that the entire cargo was delivered in damaged condition, and that the damage was the proximate cause of the loss of the cargo upon condemnation.

"The law casts upon [the carrier] the burden of the loss which he cannot explain, or, explaining, bring within the exceptional case in which he is relieved from liability." *Transatlantic Marine Claims*, 137 F.3d at 98, quoting *Assoc. Metals & Minerals Corp. v. M/V Arktis Sky*, 978 F.2d 47, 51 (2d Cir.1992) (internal quotations omitted). Unquestionably, the owner or consignee of the property has a duty to mitigate damages, but the burden of establishing that the cargo interests failed to act reasonably to mitigate damages falls on the carrier, which has caused the situation that requires the mitigation of damages in the first place. As the great Judge Friendly put it,

if the plaintiff takes such action within the range of reason, the defendant is liable for further damages resulting therefrom.... It is not fatal to recovery that one course of action, reasonably open but not followed, would have avoided further injury whereas another, also reasonable and taken, produced it. "If a

choice of two reasonable courses presents itself, the person whose wrong forced the choice cannot complain that one rather than the other is chosen." ... [T]he very impact of the injury may leave only what seems a choice of evils, or may produce a tension that partially disables the reasonable man from acting with his usual reasonableness.'

*Ellerman Lines, Ltd. v. President Harding,* 288 F.2d 288, 290 (2d Cir.1961), quoting McCormick, Damages (1935), p. 138. As a result, where the injured cargo owner is obliged to mitigate damages, "[t]he standard of what reason requires of the injured party is lower than in other branches of the law." *Id.* And another judge with great expertise in admiralty matters advises that "the burden lies on the party challenging the mitigation efforts undertaken to show that they were unreasonable.... 'The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party.'" *Sunpride (Cape) (Pty) Ltd. v. Mediterranean Shipping Co.,* Dkt. No. 01 Civ. 3493(CSH), 2003 WL 22682268 at *37 (S.D.N.Y. Nov.12, 2003) (Haight, J.), quoting *In re Kellett Aircraft Corp.,* 186 F.2d 197, 198–99 (3d Cir.1950).

These principles protect plaintiff in the instant case. Plaintiff's subrogor was presented with a difficult situation due to defendant's negligence in carrying out its contract of carriage. Defendant delivered a cargo that, due to the introduction of seawater into a container filled with a food product that needed to be kept dry, was in substantial part rendered obviously and completely ruined, and all of which was at a minimum damaged by being rendered unpleasantly smelly. It was unclear, at this point, whether any of the cargo would be acceptable to the authorities of the importing country as human food, or for any other purpose. All other things being equal, it would perhaps have been more prudent to separate the dry cargo entirely from the wet, in the hope that the smell would dissipate and the contents of the dry sacks would become acceptable for importation and sale in some amount. But even with the benefit of "hypercritical" hindsight, the record evidence does not permit a conclusion that such a course of action would have been successful in avoiding condemnation of the entire cargo by SENASA.[7]

Moreover, other things were not equal. Even assuming that the proposed course of action was theoretically available under Peruvian law, and that the decision to replace the goods in the original containers is ultimately attributable to plaintiff, those making the decision were faced with a difficult and uncertain situation. The Tramarsa warehouse authorities, who may well have had (or could reasonably have been believed by the plaintiff's agents to have had) a veto over the handling of the cargo, were evidently reluctant to store the dry sacks separately in the warehouse. There was at least some uncertainty about the governing law. Removing any of the cargo from the Tramarsa warehouse would

---

7. Defendant's only effort to prove any such thing was the introduction of an expert, who testified quite credibly about standards used by the United States authorities in comparable situations. But the Court must discount this witness's testimony as triply off-point; first, the witness had no expertise regarding the standards applied in Peru; second, he had no first-hand knowledge of the actual condition of the cargo; and third, he had no particular expertise concerning the likely course of deterioration of legumes exposed to odors of rot under various different packaging and storage scenarios. Thus, his testimony was at best speculative about what might have happened had the plaintiff's subrogor undertaken various potential courses of action.

have required the payment of a substantial import duty on a cargo that might ultimately be condemned entirely, as well as costs for testing the potentially salvageable material in an effort to demonstrate its suitability to the Peruvian authorities. The alternative of putting the cargo back into the original containers, given the steps that were taken to separate the wet from dry sacks in the process, was not self-evidently destructive of any remaining value of the cargo. Under these circumstances, it cannot be said that the actions taken with respect to the cargo, assuming they were in any way attributable to plaintiff, were outside "the range of reason."

This is particularly so where food products are involved. Courts have upheld the decision to reject entire shipments of a food product where only a few inches from the bottom were irremediably damaged. *Amstar Corp. v. S.S. Naashi*, 1978 A.M.C. 1845 (S.D.N.Y.1978). Thus, even if the decision to repackage the cargo into the original containers amounted to a decision to abandon all hope of salvage (which, on this record, does not appear to be the case), it could not be said that such a decision was completely unreasonable. Even if there was a theoretical possibility of salvaging some value from a portion of the cargo, the consignee cannot be expected to undertake significant expenses on the purely speculative hope that some part of a malodorous shipment of food might eventually be found fit for human consumption by foreign health authorities—who, if they are doing their job properly, would surely be cautious about approving the importation and sale of food products that have been subjected to questionable storage conditions and have taken on a foul odor.

Accordingly, the Court concludes that the entire shipment of peas and lentils was lost as a direct result of defendant's dere-liction in permitting the containers in which they were shipped to be invaded by several feet of seawater. About 30% of the cargo was indisputably ruined by the wetting, having been found to be wet, moldy, fermented and swollen. Given the finding that even the remainder of the sacks, which were not themselves wet, were infected by odors as a consequence of the rotting of the sacks beneath them, that portion of the cargo also was damaged upon delivery. Defendant has been unable to demonstrate that the eventual condemnation of the entire cargo could have been avoided by more prudent conservation or storage of the dry sacks, or that the consignee's failure to take the steps defendant now argues were appropriate was unreasonable under the circumstances or would have resulted in mitigation of damages. Thus, defendant is liable for the entirety of the losses experienced by plaintiff as a result of the loss of the cargo.

## FINDINGS REGARDING DAMAGES

Under COGSA, the ordinary measure of a cargo owner's recovery is "the market value of the goods at destination, in like condition as they were shipped, on the date when they should have arrived." *Internatio, Inc. v. M.S. Taimyr*, 602 F.2d 49, 50 (2d Cir.1979). *See also Gulf, Colorado & Santa Fe Ry. Co. v. Texas Packing Co.*, 244 U.S. 31, 37, 37 S.Ct. 487, 61 L.Ed. 970 (1917). The reasoning behind this rule is that the price of the freight, and the shipper's costs such as insurance and taxes, will be figured into the market rate. *See American Nat'l Fire Ins. Co. v. Yellow Freight Sys., Inc.*, 325 F.3d 924, 932 (7th Cir.2003). However, there are instances where cost-insurance-freight ("CIF") value is a proper means of assessing damages, such as "when the entire shipment is destroyed or useless." *Id.*, at 933. It is undisputed that the CIF

value of the entire cargo of 2820 bags was $41,465.46.

 Incidental damages are also recoverable, such as the cost of destruction of the cargo, demurrage fees, and survey costs. *See, e.g., Armada Supply Inc. v. S/T Agios Nikolas,* 613 F.Supp. 1459, 1470 (S.D.N.Y.1985); *Kerr–McGee Refining Corp. v. M/V La Libertad,* 529 F.Supp. 78, 86 (S.D.N.Y.1981). Plaintiff has demonstrated additional costs in the amount of $13,430.19. (Pl.Ex. 43.) [8] The allowance of prejudgment interest in admiralty is committed to the trial court's discretion, although the Second Circuit has noted that it should be granted absent exceptional circumstances. *Mitsui & Co., Ltd. v. American Export Lines, Inc.,* 636 F.2d 807, 823 (2d Cir.1981). Accordingly, plaintiff is entitled to judgment in the amount of $54,896.95, plus prejudgment interest from February 13, 2002, and costs.

 Plaintiff also seeks an award of attorneys' fees. The general rule in admiralty actions is that such an award "is discretionary with the district judge upon a finding of bad faith." *Ingersoll Milling Machine Co. v. M/V Bodena,* 829 F.2d 293, 309 (2d Cir.1987). No such finding is appropriate here. Defendant did not act in bad faith; rather, it conceded liability for the unquestionably ruined portion of the cargo and presented a good faith and reasonable argument that the remainder of the loss was not its responsibility. Although the Court has rejected that argument, it cannot be said that defendant acted in bad faith. Accordingly, the demand for attorneys' fees is rejected.

## CONCLUSION

Judgment shall be entered for plaintiff in the amount of $54,896.95, plus prejudg-

ment interest and costs. Plaintiff shall submit an appropriate form of judgment within ten days of the date of this decision.

SO ORDERED.

---

**8.** The breakdown of additional costs is as follows: survey fee ($975); incineration costs ($5,160.51); transport and labor regarding damaged cargo ($819.30); and container demurrage ($6,475.38).